854 A.2d 440

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Connie WILLIAMS, Appellant.**

Supreme Court of Pennsylvania.

Argued March 2, 2004.

Decided July 22, 2004.

Reargument Denied Sept. 28, 2004.

John L. Elash, for Connie Williams.

Michael Wayne Streily, Amy E. Constantine, Christopher H. Connors, Pittsburgh. Amy Zapp, Harrisburg, for Com.

Before: CAPPY, C.J., CASTILLE, NIGRO, SAYLOR, EAKIN, BAER, JJ.

## *OPINION*

Chief Justice CAPPY.

A jury found Appellant guilty of first-degree murder [1] and of abuse of a corpse.[2]  Subsequently, Appellant received a sentence of death.[3]  This is a direct appeal from the judgment of the sentence of death.  For the reasons that follow, we affirm.

The relevant facts of this case are as follows.  Appellant and Frances Williams, the victim in this case, married in June of 1995.  On August 12, 1999, Frances disappeared.  Immediately prior to Frances' disappearance, the couple had been experiencing marital discord that stemmed from various problems, including allegations of infidelity and drug abuse.

Following the disappearance, Appellant maintained that he did not know Frances' whereabouts and that she probably left him due to their marital problems.  On August 20, 1999, Janice Smith, Frances' younger sister, filed a missing persons report.  The Pittsburgh Police Sexual Assault/Family Crisis Unit assigned Detective Susan Keasley to investigate Frances' disappearance.  From August 24, 1999 until January 5, 2000, the investigation was limited to telephone conversations with Appellant.  However, on January 5, 2000, Appellant gave Detective Keasley permission to search his residence for evidence and clues concerning Frances' disappearance.

1.  18 Pa.C.S. § 2502(a).

2.  18 Pa.C.S. § 5510.

3.  In addition to the sentence of death, Appellant was sentenced to a consecutive term of imprisonment of one to two years for the abuse of a corpse conviction.

The following day, Detective Keasley met with Appellant at his residence and, with Appellant's permission and knowledge, tape-recorded an interview that she conducted with him. In that interview, Appellant answered several of the detective's questions in a vague and equivocal manner, which raised the detective's suspicions. Later that day and in a follow up on January 14, 2000, members of the Allegheny County Crime Lab's Forensic Serology Division inspected Appellant's residence.

In their investigation of Appellant's home, the Forensic Division utilized luminol, a chemical that illuminates when it contacts the iron component of blood. Several areas of the home, including the kitchen, the steps leading to the basement, and the basement, reacted with the luminol. These results led the investigating forensic serologist to conclude that blood had been present in those areas.

Due to this conclusion, Detectives Dennis Logan and Richard McDonald of the Pittsburgh Police Department met with Appellant at their office on the morning of January 14, 2000. The detectives advised Appellant of his *Miranda* rights,[4] and Appellant signed an acknowledgement of those rights. The detectives questioned Appellant, and at first, he insisted that he and Frances had an argument before she disappeared and that she left their home due to that argument. However, Appellant eventually relented and admitted to stabbing and killing Frances.

During this statement, Appellant said that two days before Frances' sister filed the missing persons report, Frances confronted him while he was in the kitchen trimming the fat off of a steak with a knife. He stated that she was angry with him for going through her purse and removing her marijuana. According to Appellant's statement to the detectives, the couple began to argue about Appellant's son's presence in the home, about Appellant's alleged infidelity, and about Frances' alleged drug use. He stated that Frances called him a "poor ass nigger" and that the argument escalated to the point that

4. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

he got so angry that he blew up and stabbed Frances in the chest. N.T., 1/22/02, 133–134.

Appellant then stated that after he realized that Frances was unable to talk and that she had no pulse, he dragged her body down the steps and into the basement. He said that he followed up by immediately cleaning up the kitchen. According to Appellant's statement, later that night, he wrapped Frances' body in a multicolor comforter and a white sheet. At that point, he stated that he drove to a ravine located in the North Side of Pittsburgh, where he dumped the body.

After Appellant gave this statement to the detectives, he accompanied them to the location of the body. The body was found and recovered. The Allegheny County Coroner performed an autopsy the next day and discovered that the victim's hands, feet, and head were missing. When Detective Logan questioned Appellant about these discoveries, Appellant quipped that "some people will steal anything" and then began to laugh. N.T., 1/22/02, 146.

Appellant eventually admitted to cutting up the body with a hacksaw in his basement. He stated that he did not share this information initially because he felt that "it was too gross" to tell the detectives. N.T., 1/22/02, 146. Appellant informed Detective Logan that the day after he killed Frances, he buried the body parts in a salvage yard in McKees Rocks. Following this discussion, Appellant accompanied the detectives to the salvage yard and pointed out where he buried the body parts. Subsequently, the authorities recovered the remains.

On January 23, 2002, a jury found Appellant guilty of first-degree murder and of abuse of a corpse. At sentencing, the jury found one aggravating circumstance and one mitigating circumstance. As to the aggravating circumstance, the jury found that Appellant previously had been convicted of another murder.[5] 42 Pa.C.S. § 9711(d)(11). The jury also found that

5. During the penalty phase of Appellant's trial, the parties stipulated that in 1974, Appellant pled guilty to murder and was sentenced to seven to twenty years in a state correctional institution and that he

Appellant proved the catch-all mitigating circumstance, 42 Pa.C.S. § 9711(e)(8), but ultimately decided that the aggravating circumstance outweighed the mitigating circumstance and fixed the penalty at death. 42 Pa.C.S. § 9711(c)(1)(iv).

In his direct appeal to this Court, Appellant raises three issues: whether the evidence was sufficient to support a verdict of first-degree murder; whether the Commonwealth's introduction of the testimony of four victim impact witnesses resulted in a capricious and arbitrary imposition of the death penalty; and whether the sentence of death in this case amounts to cruel and unusual punishment in violation of the Supreme Court of the United States' prohibition against the execution of the mentally retarded.

Appellant argues that the evidence the Commonwealth presented at trial was insufficient to sustain a verdict of first degree murder. "In reviewing the sufficiency of the evidence, this Court must determine whether the evidence admitted at trial, and all reasonable inferences drawn from the evidence in favor of the Commonwealth as verdict winner, supports the jury's finding of all of the elements of the offense beyond a reasonable doubt." *Commonwealth v. Tharp*, 574 Pa. 202, 830 A.2d 519, 523 (2003). Evidence is sufficient to sustain a first-degree murder conviction where the Commonwealth establishes, beyond a reasonable doubt, that a human being was unlawfully killed, that the accused is responsible for the killing, and that the accused acted with specific intent. 18 Pa.C.S. 2502(a); *Tharp*, 830 A.2d at 523. Specific intent to kill can be inferred from a defendants use of a deadly weapon on a vital part of the victims body. *Commonwealth v. Bond*, 539 Pa. 299, 652 A.2d 308, 311 (1995).

A review of the record reveals that Appellant testified at trial that he "blew up" and stabbed Frances in the chest with a knife. The record also demonstrates that Appellant subsequently dismembered and disposed of Frances body and that, after her body was recovered, the Allegheny County Corners

served his time and was paroled at the expiration of his minimum term. Penalty Phase N.T., 1/23/04, 38–39.

Office determined that Frances cause of death was a stab wound to the chest, which penetrated her breastbone and heart. We find that this evidence is clearly sufficient to sustain a verdict of first degree murder.

Despite this evidence, Appellant argues that the Commonwealth failed to prove that he had the requisite state of mind at the time of the killing to be convicted of first-degree murder. For the reasons that follow, we disagree.

Appellant concedes that he stabbed Frances in the chest. Appellant argues, however, that the stabbing was accidental. He asserts that during the argument that led to the stabbing, he attempted to throw away Frances marijuana; she subsequently called him a "poor ass nigger" and attempted to retrieve the marijuana; and then he, forgetting that he had a knife in his hand, pushed her away from the drugs. Appellant contends that because he testified to this version of the stabbing at trial and because no evidence admitted at trial contradicts this version of the stabbing, the jury merely speculated that Appellant had the specific intent to kill Frances.

 In criminal proceedings, the credibility of witnesses and weight of evidence are determinations that lie solely with the trier of fact. *Commonwealth v. Shaver,* 501 Pa. 167, 460 A.2d 742, 745 (1983). The trier of fact is free to believe all, part, or none of the evidence. *Id.* This Court will not reweigh the evidence and substitute our judgment for that of the factfinder. *Commonwealth v. Pronkoskie,* 498 Pa. 245, 445 A.2d 1203, 1206 (1982). At trial in the case *sub judice,* Appellant testified that he and Frances got into an argument, that he "blew up," and that he pushed Frances, forgetting that he had a knife in the hand with which he pushed her. N.T., 1/22/02, 197–199. The jury's verdict reflects that the jury chose not to believe that Appellant forgot that he had a knife in his hand when he stabbed Frances. Appellants testimony alone is sufficient to establish that Appellant unlawfully killed Frances, and, because Appellant stabbed Frances in her chest and through her heart, the jury could properly infer that

Appellant had the specific intent necessary to be convicted of first-degree murder. *Bond,* 652 A.2d at 311. Therefore, we find that the evidence in this case was sufficient to support a conviction of first-degree murder.

Next, Appellant makes several arguments pertaining to the admission of victim impact testimony in the penalty phase of his trial. During the penalty phase of capital murder trials in this Commonwealth, "evidence concerning the victim and the impact that the death of the victim has had on the family of the victim is admissible." 42 Pa.C.S. 9711(a)(2); *Commonwealth v. Harris,* 572 Pa. 489, 817 A.2d 1033, 1052 (2002). During the penalty phase of Appellant's trial, the Commonwealth called upon four witnesses to testify as to the impact Frances' death has had on the family. The witnesses were one of Frances' sisters and three of her daughters.

In Appellant's first argument pertaining to the victim impact testimony in his case, he asserts that "[t]he weight of the evidence (even after taking into account appropriately limited victim impact evidence) favored a sentence of life imprisonment." Brief for Appellant at 17. As stated above, this Court will not reweigh the evidence and substitute our judgment for that of the factfinder. *Pronkoskie,* 445 A.2d at 1206. Therefore, this argument fails.

Appellant then contends that in his case, the testimony of four victim impact witnesses was excessive. First, Appellant argues that this testimony was an excessive outpouring of grief, which "unconstitutionally focused the jury's attention on the victims life, rather than on the crime of which the jury found Defendant guilty." Brief for Appellant at 19. Appellant states that the nature and number of the victim impact testimony in this case functioned as a "super aggravating factor" and as an "arbitrary tie-breaker" for the aggravating and mitigating circumstances. Appellant relies on a concurring and dissenting opinion in *Commonwealth v. Rice,* 568 Pa. 182, 795 A.2d 340 (2002), *cert. denied sub nom.,* 538 U.S. 926, 123 S.Ct. 1571, 155 L.Ed.2d 319 (2003) and a dissenting opinion in *Commonwealth v. Means,* 565 Pa. 309, 773 A.2d 143

(2001) [6] for the general propositions that he puts forth under this part of his victim impact testimony claim.

This Court has considered and rejected these arguments against the admissibility of victim impact testimony. *Id.* A majority of this Court has, however, held that victim impact testimony is constitutionally permissible evidence in capital trials. *Harris,* 817 A.2d at 1052–53. Therefore, Appellant is not afforded relief under these arguments.

Appellant also argues that in his case, victim impact testimony from four witnesses was so excessive that the testimony "infected the sentencing proceeding with unfairness as to render the jury's imposition of the death penalty a denial of due process." Appellant's Brief at 21. Further, Appellant would seem to have this Court find that the testimony of four victim impact witnesses is *per se* excessive in this case because Appellant only killed one victim.

In *Means,* we stated that "victim impact testimony will only be admitted where the Commonwealth establishes that the victim's death did in fact have an impact on the victim's family." 773 A.2d at 158. We concluded that once the Commonwealth has met this threshold for admissibility, "the exact method victim impact testimony is presented is left to the discretion of the trial court." *Id.* [7] We observed, however, that "relief is always available to correct those situations where unduly prejudicial information is introduced which renders the sentencing process fundamentally unfair." *Id.* at 150

---

**6.** The concurring and dissenting opinion in *Rice* was authored by then Mr. Chief Justice Zappala, and the dissenting opinion in *Means* was authored by then Mr. Justice Zappala and joined by then Mr. Chief Justice Flaherty.

**7.** *Means* was an Opinion Announcing the Judgment of the Court; however, a majority of the Court agreed that trial courts should have substantial control over the manner in which victim impact testimony is presented to sentencing juries. *See* 773 A.2d at 160 (Saylor, J., concurring)(stating that "I also join in that portion of the majority opinion advocating careful and substantial control by the trial courts over the manner in which victim impact testimony is presented to sentencing juries in order to avoid the insertion of passion and undue prejudice into the proceedings.")

(citing to *Payne v. Tennessee*, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991)).

■ During the penalty phase of Appellant's trial, Janice Smith, Frances' sister, testified first. Penalty Phase N.T., 1/23/02, 40–43. In her brief testimony, Ms. Smith testified to her close relationship with Frances and to the effect that her sister's death has had on her. Catherine Miller, Frances' daughter, testified next. Penalty Phase N.T., 1/23/02, 43–46. She also briefly testified to the nature of her relationship with her mother and to the effect her mother's death has had on her. Frances' youngest child, Carol Lee Miller, also testified. Penalty Phase N.T., 1/23/02, 46–51. In her testimony, Ms. Miller described her relationship with her mother and how much her life has changed since her mother's death. Janet Lee Winston, Frances' oldest daughter, was the last victim impact witness to testify. Penalty Phase N.T., 1/23/02, 51–54. She briefly testified to her relationship with her mother and how difficult her life has been since her mother's murder.

■ We find that the cumulative effect of the testimony demonstrated that Frances' murder has been difficult on her family. Therefore, the testimony falls within the admissibility rule announced in *Means* and discussed above. Moreover, we conclude that the testimony of these four witnesses was not excessive or unduly prejudicial, and therefore, this testimony did not render the sentencing process to be fundamentally unfair.

Additionally, we decline to establish a *per se* rule regarding the number of victim impact witnesses that may be presented in any given proceeding. To do so would be arbitrary and contrary to considering victim impact issues on the case by case basis that 42 Pa.C.S. 9711(a)(2) implicitly requires. Therefore, because we find that the trial court did not abuse its discretion by allowing four victim impact witnesses to testify in this case, this claim fails.

■ Next, Appellant contends that the victim impact testimony caused the jury to sentence Appellant to death based on passion, prejudice, or other arbitrary factors. Appellant ar-

gues that in this Commonwealth, a sentence of death must be set aside when the sentence is based on passion, prejudice, or other arbitrary factors.[8] At the conclusion of the penalty phase of Appellant's trial, however, the court appropriately instructed the jury, *inter alia*, as to the burdens of proof associated with aggravating and mitigating circumstances, as to how to weigh such circumstances, and as to how to utilize victim impact testimony in weighing the circumstances.[9] Moreover, the court informed the jury as to the nature of victim impact statements and specifically stated that the jury's "consideration must be limited to a rationale [sic] inquiry into the culpability of the defendant, not an emotional response to the evidence." Penalty Phase N.T. 1/24/02, 137. The court went on to state that "[t]he sentence you impose must be in accordance with the law as I have instructed you and not be based on sympathy, prejudice, emotion, or public opinion and not based solely on victim impact testimony." Penalty Phase N.T. 1/24/02, 137. Therefore, because the jury is presumed to have followed the trial court's instructions, *Commonwealth v. Jones*, 542 Pa. 464, 668 A.2d 491, 504 (1995), this claim fails.

Appellant's last claim is that the imposition of the death penalty in his case amounts to cruel and unusual punishment due to the Supreme Court of the United States' prohibition against the execution of the mentally retarded. In forwarding this argument, Appellant relies solely on the High Court's holding in *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).

In *Atkins*, the Court stated that the execution of the mentally retarded is excessive punishment under the Eighth Amendment of the United States Constitution. *Id.* at 321, 122 S.Ct. 2242. Based on this conclusion, the Court held that "death is not a suitable punishment for a mentally retarded

8. Appellant relies on 42 Pa.C.S. § 9711(h)(3)(i) for this contention. Section 9711(h)(3)(i) states that this Court "shall affirm the sentence of death unless it determines that: ... the sentence of death was the product of passion, prejudice or any other arbitrary factor."

9. At trial, Appellant made no objection to the court's instruction to the jury in regard to victim impact testimony, and he makes no argument to this Court that the trial court's instruction was improper.

criminal." *Id.* However, the Court noted that determining who is in fact mentally retarded is a much debated topic. *Id.* at 317, 122 S.Ct. 2242. Rather than enunciating a universal standard for determining whether a criminal defendant is mentally retarded, the Court left it up to the states to develop appropriate ways to enforce this restriction upon their execution of sentences. *Id.*

Recently, in *Commonwealth v. Mitchell*, 576 Pa. 258, 839 A.2d 202 (2003), this Court encountered and addressed an *Atkins* claim, similar to Appellant's claim, in a direct appeal of a sentence of death. In *Mitchell*, a jury convicted Isaac Mitchell, Sr. of, *inter alia*, two counts of first-degree murder and fixed the penalty at death. *Id.* at 205. In his direct appeal to this Court, Mitchell raised, *inter alia*, a claim under *Atkins* in which he asserted that he was mentally retarded and, therefore, was ineligible for a death sentence. *Id.* at 209.

We began our analysis of Mitchell's *Atkins* claim by noting that "[i]n order to address the merits of [Mitchell's] individual claim this court would need to develop and adopt universal standards for carrying out the mandate of the *Atkins* decision in Pennsylvania." *Id.* We decided that our ability to assess the merits of Mitchell's claim and to announce a standard for implementing *Atkins* was impaired because no *Atkins* defense existed when the trial court convicted and sentenced Mitchell.[10] *Id.* Due to this gap, the record lacked evidence of whether Mitchell was indeed mentally retarded, and if he was, what standards were used to classify him as such. *Id.* We felt further handicapped in deciding Mitchell's *Atkins* claim because we were "without the benefit of adversarial argument and judicial opinion on the definition of mental retardation and the correct juncture in a capital trial to address the issue of whether a defendant is mentally retarded." *Id.*

In *Mitchell*, we did decide that when a defendant asserts mental retardation as a bar to the imposition of the death penalty, the defendant carries the burden of proving such an

10. Mitchell was sentenced on June 28, 2000, while the United States Supreme Court decided *Atkins* on June 20, 2002. *Mitchell*, 839 A.2d at 209.

assertion to a preponderance of the evidence. *Id.* at 211 n. 8. However, this Court did not determine whether Mitchell was retarded, nor did we set a standard for making such a determination. Rather, we decided that considering the state of the record and the importance of Mitchell's *Atkins* claim, the claim was best suited for full review in a collateral challenge under 42 Pa.C.S. 9543(a)(2)(vi)(stating that one way a petitioner is eligible for relief upon collateral review is by proving by a preponderance of the evidence that the petitioner's conviction resulted from "[t]he unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the trial if it had been introduced.") *Id.* at 211.

In the case *sub judice*, this Court is again faced with a situation where we are asked to decide the merits of an appellant's *Atkins* claim, which was unavailable to him at the time of his trial,[11] while simultaneously developing a standard for implementing the holding in *Atkins*. The issue of whether Appellant is mentally retarded was never litigated at trial and no standard for determining whether Appellant is mentally retarded was stipulated to or argued at trial. Therefore, the trial record, as it was developed, cannot be used to determine whether Appellant is truly mentally retarded, and if so, what standard was utilized to classify him as such. As was the case in *Mitchell*, this Court is, again, without the benefit of adversarial argument and judicial opinion on the definition of mental retardation and on the correct juncture in a capital trial to address the issue of whether a defendant is mentally retarded.

Therefore, although the relief sought in *Mitchell* is different from the relief Appellant seeks,[12] the circumstances are similar enough to warrant the same outcome. Appellant's *Atkins* claim is best suited for full review upon a collateral challenge. 42 Pa.C.S. 9543(a)(2)(vi).

11. Appellant was sentenced on January 25, 2002, while *Atkins* was decided on June 20, 2002.

12. Appellant seeks to have this Court vacate his sentence of death, whereas Mitchell sought to have this Court remand his case for an evidentiary hearing to prove he was mentally retarded.

■ Finally, in accordance with our statutory duty, this Court shall affirm a sentence of death unless "(i) the sentence of death was the product of passion, prejudice, or any other arbitrary factor; or (ii) the evidence fails to support the findings of at least one aggravating circumstance specified in subsection (d)." 42 Pa.C.S. 9711(h)(3). After a careful review of the trial record, we conclude that the sentence of death in Appellant's case was not the product of passion, prejudice, or any other arbitrary factor. In addition, as stated above, the parties stipulated that Appellant previously was convicted of murder. Therefore, we also conclude that the evidence supports the jury's finding of the aggravating circumstance in this case. Although the jury found that Appellant proved the "catch-all mitigator," the jury decided that the aggravating circumstance outweighed the mitigating circumstance. As a result of such a finding, the jury was statutorily required to impose a sentence of death. 42 Pa.C.S. 9711(c)(1)(iv).

Accordingly, for all of the foregoing reasons, we affirm the verdict of first-degree murder and the sentence of death.[13]

Justice NEWMAN did not participate in the consideration or decision of this case.

Justice NIGRO files a concurring opinion.

Justice NIGRO, Concurring.

I join the majority opinion but write separately only to address its analysis as it relates to Appellant's arguments that victim impact testimony was improperly admitted in the penalty phase of his trial. In *Commonwealth v. Means,* I dissented from the lead opinion's conclusion that Pennsylvania's statutory scheme governing victim impact evidence in the penalty phases of capital trials was constitutional. *See Means,* 565 Pa. 309, 773 A.2d 143, 162–167 (2001) (Nigro, J., dissenting). To correct what I saw as the constitutional infirmity of that

---

**13.** The Prothonotary of this Court is directed to transmit to the Governor's office a full and complete record of the trial, sentencing hearing, imposition of sentence and opinion and order by the Supreme Court in accordance with 42 Pa.C.S.A. § 9711(i).

scheme, I set forth a series of procedural safeguards that would, in my view, prevent a jury from using victim impact evidence in an arbitrary and capricious manner when deciding whether the death penalty is an appropriate sentence. *Id.* at 165–166. While it is clear in the instant case that some of those procedural safeguards were met, it is equally clear that others were not.[1] I nonetheless recognize that, under the controlling precedent of this Court, Appellant is not entitled to relief on his claims and I therefore join the majority's disposition to that effect. *See Means,* 773 A.2d at 147–58; *Commonwealth v. Harris,* 572 Pa. 489, 817 A.2d 1033, 1052–1053 (2002). *Accord Commonwealth v. Rice,* 568 Pa. 182, 795 A.2d 340, 363–64 (2002) (Nigro, J. concurring) (recognizing *stare decisis* effect of decision in *Means* ).

---

1. For example, I stated in my dissenting opinion that I would only allow the Commonwealth to introduce victim impact evidence if the defendant presents evidence pursuant to the catch-all mitigating provision, 42 Pa.C.S. § 9711(e)(8). *See Means,* 773 A.2d at 165 (Nigro, J., dissenting). Here, it is clear that Appellant presented such evidence, as the jury found the existence of that mitigator. At the same time, I also stated in my dissenting opinion that, absent special circumstances, I would only allow one witness to testify on behalf of the victim's family. *Id.* Here, however, four witnesses offered victim impact testimony at Appellant's penalty phase hearing and there does not appear to be any "special circumstances" that would warrant that amount of testimony.