61 A.3d 979

COMMONWEALTH of Pennsylvania, Appellant

v.

Connie WILLIAMS, Appellee.

Supreme Court of Pennsylvania.

Submitted Sept. 20, 2011.

Decided Jan. 22, 2013.

Amy Elizabeth Constantine, Michael Wayne Streily, Ronald Michael Wabby, Jr., Allegheny County District Attorney's

Office, Amy Zapp, PA Office of Attorney General, Stephen Andrew Zappala, Jr., District Attorney, for Commonwealth of Pennsylvania.

Billy Horatio Nolas, Federal Community Defender Office, Eastern District of PA, for Connie Williams.

CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, J.J.

## OPINION

Justice EAKIN.

The Commonwealth appeals from the order of the Court of Common Pleas of Allegheny County granting appellee's Post-Conviction Relief Act (PCRA)[1] petition and vacating his sentence of death on the basis that appellee demonstrated, by a preponderance of the evidence, that he is mentally retarded. As we find the PCRA court's factual findings are supported by substantial evidence, and its legal conclusions drawn therefrom are free from error, we affirm.

A jury convicted appellee of first degree murder[2] and abuse of a corpse[3] for stabbing his wife, Frances Williams, to death.[4] At the penalty phase, the jury found one aggravating circumstance[5] outweighed two mitigating circumstances.[6] Consequently, appellee was sentenced to death for murder, see id., § 9711(c)(1)(iv), and a consecutive term of one to two years imprisonment for abuse of a corpse. After the trial court

1. 42 Pa.C.S. §§ 9541–9546.

2. 18 Pa.C.S. § 2501–2502.

3. *Id.*, § 5510.

4. The underlying facts are detailed in our disposition of appellee's direct appeal. *See Commonwealth v. Williams*, 578 Pa. 504, 854 A.2d 440, 442–44 (2004), *cert. denied, Williams v. Pennsylvania*, 546 U.S. 829, 126 S.Ct. 45, 163 L.Ed.2d 78 (2005).

5. Appellee had been convicted of a previous murder. 42 Pa.C.S. § 9711(d)(11).

6. Appellee was under the influence of extreme mental or emotional disturbance, *id.*, § 9711(e)(2), and he proved additional mitigating evidence concerning his character, record, and the circumstances of his offense, *id.*, § 9711(e)(8).

denied appellee's post-sentence motion, he appealed to this Court.

On direct appeal, appellee argued the imposition of the death penalty amounted to cruel and unusual punishment in violation of the United States Supreme Court's prohibition against the execution of the mentally retarded. *See Atkins v. Virginia,* 536 U.S. 304, 321, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).[7] We held, because the trial record was devoid of evidence pertaining to appellee's mental retardation and no standard for classifying a defendant as mentally retarded had been established for the purpose of analyzing *Atkins* claims in Pennsylvania, appellee's claim was best suited for collateral review. *See* 42 Pa.C.S. § 9543(a)(2)(vi); *Williams,* at 448–49 (citing *Commonwealth v. Mitchell,* 576 Pa. 258, 839 A.2d 202, 209, 211 (2003)). Finding appellee's remaining claims meritless, we affirmed his death sentence. *Id.,* at 449.

Appellee received new counsel and filed a PCRA petition, which was subsequently amended. The PCRA court held an evidentiary hearing, limited to appellee's *Atkins* claim, and deferred his remaining issues pending the claim's resolution. PCRA Court Opinion, 4/15/10, at 3, 10–11. The court heard expert testimony presented by both the Commonwealth and appellee during the hearing. Appellee also presented testimony from several lay witnesses. Consequently, the PCRA court determined appellee proved, by a preponderance of the evidence, he was mentally retarded. *Id.,* at 11–12. Accordingly, the court granted the portion of appellee's amended petition seeking to vacate the death sentence, and imposed a sentence of life imprisonment. *Id.,* at 12.

The Commonwealth appealed to this Court, limited to the issue of "[w]hether the PCRA court erred by concluding that appellee is mentally retarded as defined under *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002)[,] and *Commonwealth v. Miller,* 585 Pa. 144, 888 A.2d 624 (2005), where the record as a whole contains abundant

---

7. *Atkins* was decided in June, 2002, five months after appellee was sentenced to death.

evidence that appellee does not have significant adaptive deficits[.]" Brief of Appellant, at 4.

■■■ Our standard of review of the PCRA court's determination regarding whether a petitioner is mentally retarded is a mixed question of law and fact, for which the standard of review is as follows:

A question involving whether a petitioner fits the definition of mental retardation is fact intensive as it will primarily be based upon the testimony of experts and involve multiple credibility determinations. Accordingly, our standard of review is whether the factual findings are supported by substantial evidence and whether the legal conclusion drawn therefrom is clearly erroneous. We choose this highly deferential standard because the court that finds the facts will know them better than the reviewing court will, and so its application of the law to the facts is likely to be more accurate.

*Commonwealth v. Crawley*, 592 Pa. 222, 924 A.2d 612, 616 (2007) (citations and quotation omitted).

■ To obtain relief on an *Atkins* claim, the defendant must show, by a preponderance of the evidence, *see id.*, at 616, he is mentally retarded as defined by the American Psychiatric Association (APA) or the American Association of Mental Retardation (AAMR).[8] *Miller*, at 626–27.[9]

8. As of January 1, 2007, the AAMR has been renamed the American Association on Intellectual and Developmental Disabilities (AAIDD).

9. *Atkins* left the task of setting standards and procedures for adjudicating the mental retardation of a defendant in a capital case to each state; however, when the Pennsylvania legislature had not enacted *Atkins* legislation nine years after the United States Supreme Court's decision, this Court exercised its power of judicial administration and set forth the procedure for implementing *Atkins* in Pennsylvania. *See Commonwealth v. Sanchez*, 614 Pa. 1, 47–49, 36 A.3d 24, 52 (2011). *Sanchez* held "there is no constitutionally dictated right or 'preference' affording defendants their choice of fact-finder for *Atkins* determinations made at the trial level ..., nor is there a constitutionally dictated right or preference for when the *Atkins* determination is to be made (prior to trial, after guilt phase, during penalty phase)." *Commonwealth v. DeJesus*, 619 Pa. 70, 58 A.3d 62, 82 (2012) (citing *Sanchez*, at 55–61). *Sanchez* also reaffirmed the burden of proving an *Atkins* claim is on the defense by a preponderance of evidence, and held the determination

The AAMR defines mental retardation as a "disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in the conceptual, social, and practical adaptive skills." Mental Retardation[: Definition, Classifications, and Systems of Supports (10th ed. 2002) (Mental Retardation)], at 1. The American Psychiatric Association defines mental retardation as "significantly subaverage intellectual functioning (an IQ of approximately 70 or below) with onset before age 18 years and concurrent deficits or impairments in adaptive functioning." [Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1992) (DSM–IV),] at 37. Thus, ... both definitions of mental retardation incorporate three concepts: *1) limited intellectual functioning; 2) significant adaptive limitations; and 3) age of onset.*

*Id.,* at 629–30 (footnote omitted) (emphasis added); *see Crawley,* at 614–15 (reaffirming *Miller's* standard). Accordingly, a defendant may establish mental retardation under either the AAMR or APA/DSM–IV classification systems so long as he proves by a preponderance of the evidence he has limited or subaverage intellectual functioning, significant adaptive limitations, and the onset of his subaverage intellectual functioning occurred before he was 18 years old.

regarding mental retardation, if made by a jury, must be unanimous and should be made before consideration of the aggravators and mitigators. *Sanchez,* at 63. In *DeJesus,* this Court confirmed the burden of proof for a defendant advancing an *Atkins* claim on collateral review remains a preponderance of the evidence. *DeJesus,* at 84–85. We further held while the additional evidentiary considerations articulated in *Ex Parte Briseno,* 135 S.W.3d 1 (Tex.Crim.App.2004) (identifying additional evidentiary factors to be considered in assessing adaptive functioning prong of mental retardation standard), were helpful for the fact-finder, particularly in light of the prospect of malingering in cases where the *Atkins* claim was raised retrospectively on collateral review, such factors would not be elevated to any particular favored or presumptive status. *DeJesus,* at 85–87. Here, appellee's *Atkins* claim was determined by the trial court in post-conviction proceedings; thus, *DeJesus* is applicable. Accordingly, appellee bore the burden of establishing his claim by a preponderance of the evidence. The Commonwealth does not raise any claims of malingering, but instead challenges the credibility of appellee's experts and the weight the PCRA court assigned to the evidence; therefore, *Briseno's* considerations, as acknowledged in *DeJesus,* are not implicated.

The best representation of limited intellectual functioning is an individual's IQ score. *Miller*, at 630 (citing Mental Retardation, at 14, 57; DSM–IV, at 39). Considered within the limits of subaverage intellectual functioning is the standard error of measurement (SEM) for the specific assessment instruments used, which is estimated to be three to five points for well-standardized measures of general intellectual functioning. *Id.* Thus, a limited intellectual capability is commonly ascribed to an individual who tests within the SEM of the subaverage intellectual functioning range; its upper limit is 75 on the Wechsler scales. *Id.* (citing Mental Retardation, at 57–58; DSM–IV, at 39).

 Although an individual's IQ score is the primary measurement for limited intellectual functioning, because the interaction between limited intellectual functioning and deficiencies in adaptive skills is necessary to establish mental retardation, a sufficiently high IQ score, in itself, will not bar a court from finding an individual is mentally retarded. *Id.*, at 630–31. Nor will a low IQ score in itself categorize a person as mentally retarded. *Id.* For instance, an individual with an IQ score between 71 and 75 must have major deficiencies in adaptive behavior, whereas an individual with an IQ score lower than 70 must also be significantly deficient in adaptive behavior to be found mentally retarded. *Id.*

As pertaining to the second prong, adaptive behavior is defined as "the collection of conceptual, social, and practical skills that have been learned by people in order to function in their everyday lives, and limitations on adaptive behavior are reflected by difficulties adjusting to ordinary demands made in daily life." *Id.*, at 630 (citing Mental Retardation, at 73; DSM–IV, at 40) (footnote omitted). "[P]erformance that is at least two standard deviations below the mean of either (a) one of the following three types of adaptive behavior: conceptual, social, or practical, or (b) an overall score on a standardized measure of conceptual, social and practical skills" constitutes significant limitations in adaptive functioning as defined by the

AAMR. *Id.,* at 630–31 (citing Mental Retardation, at 14).[10] These standardized measures should be considered in light of the measurement's SEM to determine whether an individual's behavior meets the definition of "significantly limited." *Miller,* at 631.

"The DSM–IV requires significant limitations in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." *Id.,* at 630 n. 8 (citing DSM–IV, at 39). For assessing adaptive ability, the DSM–IV also considers "the suitability of the instrument to the person's socioeconomic background, education, associated handicaps, motivation, and cooperation. . . . In addition, behaviors that would normally be considered maladaptive (e.g., dependency, passivity) may be evidence of good adaptation in the context of a particular individual's life (e.g., in some institutional settings)." DSM–IV, at 42. For both the DSM–IV and AAMR, an individual's scores prior to age 18 and his present functioning are critical

10. Examples of adaptive behavior skills in the AAMR are as follows:
 *Conceptual Skills*
 - Receptive and expressive language
 - Reading and writing
 - Money concepts
 - Self-directions
 *Social Skills*
 - Interpersonal
 - Responsibility
 - Self-esteem
 - Gullibility (likelihood of being tricked or manipulated)
 - Naïveté
 - Follows rules
 - Obeys laws
 - Avoids victimization
 *Practical Skills*
 - Personal activities of daily living such as eating, dressing, mobility and toileting
 - Instrumental activities of daily living such as preparing meals, taking medication, using the telephone, managing money, using transportation and doing housekeeping activities
 - Occupational skills
 - Maintaining a safe environment
 Mental Retardation, at 42, Table 3.1.

in determining whether he is mentally retarded. *Id.*, at 47; Mental Retardation, Table 1.2.

In the present case, the PCRA court heard seven expert witnesses, five for appellee and two for the Commonwealth. PCRA Court Opinion, 4/15/10, at 3–9. The first expert to testify for appellee was Dr. Daniel Martell, an assistant clinical psychiatrist in psychiatry and psychobehavioral science. N.T. PCRA Hearing, 1/12/10, at 9. Dr. Martell was one of the state psychologists to testify in favor of the state of Virginia in the landmark case, *Atkins*, as well as for the federal government in the Unibomber case. *Id.*, at 9–10, 100. He also testified for the defense in *Miller*, the first Pennsylvania decision to apply *Atkins*. *Id.*, at 10.

After reviewing other clinicians' test results, Dr. Martell determined to a reasonable degree of psychological and neuropsychological certainty that appellee suffered from mental retardation as defined by the DSM–IV and AAMR. *Id.*, at 13–14. After averaging every IQ test given to appellee, including group testing and non-reliable methods, Dr. Martell determined appellee's average IQ score was 71.6. *Id.*, at 41. Over appellee's lifetime, his individual IQ score averaged 67.8. *Id.*, at 33. Hence, the totality of appellee's scores, regardless of the inclusion or exclusion of the invalid screening tests, was never above 75. *Id.*, at 49. Accordingly, Dr. Martell found appellee satisfied the first prong of the *Miller* test.

Dr. Martell also testified appellee exceeded the requirements of *Miller's* second prong. He determined appellee satisfied all three subsections of the AAMR. *Id.*, at 63–64. Additionally, out of the 11 skill areas of the DSM–IV, appellee was deficient in seven: communication, self-care, social/interpersonal skills, self-direction, functional academic skills, home living, and health. *Id.*, at 59–60. Dr. Martell acknowledged appellee was able to have a family, care for his children, and he engaged in self-direction when he murdered the victim and took subsequent actions to hide the evidence. *Id.*, at 93–95. Nevertheless, Dr. Martell testified all individuals with mental retardation have some relative strengths in functionality—the true diagnosis of mental retardation comes from examining

the person's weaknesses. *Id.,* at 69–70. Dr. Martell found appellee showed profound impairment in the area of academic skills: he cannot read, write, or perform arithmetic. *Id.,* at 48, 51–52. At age 49, appellee's literacy ability was equal to that of a second grader. *Id.,* at 48. For employment, appellee worked in a sausage factory and as a disc jockey, but required help with both of these jobs. *Id.,* at 67, 73. He required supervision at the sausage factory because he had difficulty remembering what spices went into the sausage mix; while working as a disc jockey, he needed assistance reading song titles when a specific song was requested. *Id.* Appellee is also extremely naïve and consistently manipulated by others. *Id.,* at 58. He would loan his car to his friends, who would then attempt to sell it; on one occasion, after buying a car, he tried to return it the next day—failing to understand the sales agreement. *Id.,* at 104. In addition, appellee neglected, and continues to neglect, his health by continuously refusing treatment for his diabetes. *Id.,* at 59.

Dr. Martell also concluded appellee met *Miller's* third prong. Appellee's average individual IQ score prior to age 18 was 53.6. *Id.,* at 33. Appellee repeated first grade, is illiterate, needed speech correction, and failed to succeed in school despite a special education curriculum. *Id.,* at 17, 22, 48. Socially, appellee had no childhood friends, and was ostracized and bullied by neighborhood children. *Id.,* at 55. He was unable to score on the social portion of the Vineland scale testing, which was given to him as a child, because he had no social interaction. *Id.* Additionally, appellee was found to have numerous risk factors for mental retardation, including: numerous head traumas as a child, extensive abuse at home, organic brain damage, and genetic predisposition (his mother had a low IQ, and his brother was mentally retarded). *Id.,* at 76–81.

Dr. Martell further rejected the assertion that appellee could be considered in the borderline intellectual functioning group, because an individual cannot have similar IQ scores to appellee, along with the wealth of adaptive deficits, and not be diagnosed as mentally retarded. *Id.,* at 85–86. In addition,

Dr. Martell refuted the proposition of appellee malingering on the IQ tests, as he found appellee lacked incentive to perform poorly and had high scores on symptom validity tests (Mittenberg Index, Test of Memory Malingering, and Rey 15 Item). *Id.,* at 41–47. Conclusively, Dr. Martell testified appellee was a "textbook case" of mental retardation. *Id.,* at 83.

The second expert to testify on appellee's behalf was Dr. Barry Crown, the head of neuropsychology and director of continuing psychological education at Miami Children's Hospital. *Id.,* at 109–10. He is accredited in neurodevelopmental disabilities and serves as coordinator of medical education for Baptist Health of South Florida. *Id.,* at 110–11. Dr. Crown administered the most recent mental health intelligence test to appellee, finding to a reasonable degree of psychological and neuropsychological certainty that appellee has brain damage and is mentally retarded as defined by the DSM–IV–TR [11] and AAMR. *Id.,* at 112–15.

Specifically, Dr. Crown conducted the WAIS–IV examination on appellee, determining his overall IQ was 72. *Id.,* at 117. While administering the exam, Dr. Crown observed appellee "trying hard" and "self-obsessing" over his inability to perform tasks, indicating he was not malingering or trying to be deceptive. *Id.,* at 116–17. Although appellee did show some strength in his perceptual capability, he ultimately scored in the bottom 18th percentile. *Id.,* at 119–20. By analyzing appellee's life structure, Dr. Crown also confirmed Dr. Martell's finding appellee has significantly subaverage intellectual functioning according to the DSM–IV–TR and AAMR. *Id.,* at 145, 154–59, 190. He also noted appellee exhibited risk factors for mental retardation long before the age of 18. *Id.,* at 160–61. Dr. Crown consistently referred to appellee as "trainable"—his life revolving around routine learning activities in order to function. *Id.,* at 159. For example, appellee is capable of making a cheese sandwich only because his body has been trained to make a cheese sandwich by making it hundreds of times. *Id.*

11. This is the DSM Fourth Edition, Text Revision.

Appellee's third expert was Dr. Jethro W. Toomer, a forensic psychologist who has privately practiced clinical and forensic psychology for approximately 25 years. N.T. PCRA Hearing, 1/13/10, at 225–26. Dr. Toomer concluded to a reasonable degree of certainty appellee suffers from mental retardation, citing appellee's significant subaverage intellectual functioning and substantial deficits in adaptive functioning under the DSM–IV and AAMR criteria. *Id.*, at 232–33. Similar to appellee's other experts, Dr. Toomer found appellee has "brain damage" or "brain dysfunction," which he explained may be the cause of appellee's adaptive deficits and mental retardation. *Id.*, at 267–68.

Dr. Toomer tested appellee's adaptive functioning levels with the Scale of Independent Behavior Revised (SIB–R).[12] N.T. PCRA Hearing, 1/13/10, at 238. To properly assess appellee's adaptive functioning level, Dr. Toomer relied on collateral data, including interviews of those who knew appellee as a child, as well as other sources of information. *Id.*, at 240–41. Dr. Toomer administered the shorter SIB–R to appellee and the longer SIB–R to appellee's brother, sister, and sister-in-law. *Id.*, at 240–43. After reviewing the data, Dr. Toomer determined appellee had significant adaptive functioning deficits in all areas except gross motor skills, which were determined to be severely limited. *Id.*, at 243–44. Appellee's SIB–R scores also established he has at least eight deficiencies under the DSM–IV–TR criteria and all three deficiencies under the AAMR criteria. *Id.*, at 255–57.

The fourth expert to testify on appellee's behalf was Dr. William Musser, a neurologist and psychiatrist who was part of the John Merck Program at Western Psychiatric Clinic, which focuses on treating patients with mental retardation and other developmental disabilities. *Id.*, at 300. After evaluating appellee, consulting prior test results, and relying on additional collateral matters, Dr. Musser concluded to a reasonable degree of medical certainty appellee has impaired cognitive

12. The SIB–R divides an individual's broad independence into four levels: motor skills, social communication, personal living, and community living. *Id.*, at 242.

functioning and suffers from mental retardation. *Id.*, at 302–03. Dr. Musser explained mental retardation is formed from a brain injury known as "static encephalopathy," which occurs at the end of pregnancy, at the time of delivery, or during very early stages in life, and is not the result of childhood abuse. *Id.*, at 317–18.

Rejecting the contention appellee has borderline intellectual functioning, Dr. Musser found appellee was properly diagnosed with mental retardation because mental retardation is an inadequate IQ in addition to adaptive deficits, whereas borderline intellectual functioning is an inadequate IQ without adaptive deficits. *Id.*, at 316, 327, 332. Appellee suffers from subaverage IQ and significant adaptive deficits, such as the inability to recite the alphabet, spell, or sign his son's homework. *Id.*, at 305, 309, 334. Dr. Musser acknowledged a lack of schooling may have had some bearing on appellee's IQ scores; however, IQ tests, unlike achievement tests, are not based on an individual's amount of schooling. *Id.*, at 342–43.

After reviewing all the data, Dr. Musser also concluded appellee had significant deficits under eight of the DSM–IV criteria, including: communication, functional academics, home living, social functioning, using community resources, daily living, health and safety, and practical skills. *Id.*, at 313–15, 320–21. He also found appellee deficient in all three domains of the AAMR, *id.*, and all of these deficiencies were present before the age of 18. *Id.*, at 316. Dr. Musser further concurred with previous experts that mentally retarded people, such as appellee, can function in society and are able to obtain and hold "low skilled jobs" as well as have a family. *Id.*, at 319–20.

Next, Dr. Julie Kessel, a board certified psychiatrist, testified in appellee's case-in-chief, as well as on rebuttal. After conducting a four-hour interview with appellee, Dr. Kessel concluded to a reasonable degree of psychiatric certainty that appellee suffers from mild mental retardation, an unspecified cognitive disorder, and dissociative disorder. N.T. PCRA Hearing, 1/14/10, at 372, 389. Dr. Kessel diagnosed appellee based on her observation of appellee's personality and her

review of his academic record and social patterns. *Id.*, at 372–73, 389.

Dr. Kessel described appellee's life as consistent with that of someone who is mentally retarded. She discussed how, prior to age 18, appellee was significantly unsuccessful academically and socially. *Id.*, at 381–87. As a child, he scored in the mental retardation range on IQ tests and was placed in special education classes. *Id.*, at 386–87. His school records indicated impairments in work, as well as in health and safety. *Id.*, at 387. In addition, appellee was unable to read or write even though he regularly attended school and exhibited no behavioral problems. *Id.*, at 398–99. Appellee also had deficient interpersonal skills as a child. *Id.*, at 382. He was unable to engage in interactions with peers and was constantly chastised, ridiculed, and bullied. *Id.*, at 382–83. At one point in his childhood, he was attacked and thrown off a bridge. *Id.*, at 383.

Dr. Kessel described how appellee's life as an adult was a "series of failures" in academics, employment, and relationships. *Id.*, at 389–90. Appellee's adult IQ score was 72, well within the mentally retarded range, and he remains illiterate. *Id.*, at 418. Although appellee was employed, he was only able to engage in low-functioning jobs, such as stocking shelves, pumping gas, and putting food on a plate. *Id.*, at 381. Dr. Kessel further explained appellee's adult relationships were as tragic as his childhood ones. Appellee was still victimized by his peers. Appellee's friends continuously preyed on him and took advantage of his generous nature. *Id.*, at 384. In addition, appellee was brutally raped and assaulted in prison, despite his large, physical stature. *Id.*, at 385–86. Although appellee acquired a few relationships with women and eventually married, all ended in disaster. *Id.*, at 383.

On rebuttal, Dr. Kessel further testified the Commonwealth's experts erroneously diagnosed appellee with antisocial personality disorder because an individual with the disorder does not value or want significant relationships, whereas appellee is remarkably pro-social—he is extremely loyal to his family, has a strong work ethic, and is vigorously opposed to

child abuse. *Id.*, at 392–94. According to Dr. Kessel, appellee's isolated aggression and acts of gullibility are consistent with mental retardation, brain damage, and dissociative disorder—not antisocial personality disorder. *Id.*, at 387–88, 394–95.

The Commonwealth had two experts testify on its behalf, Dr. Daniel Marston and Dr. Bruce Wright. Both concluded to a reasonable degree of psychological and medical certainty that appellee suffers from borderline intellectual functioning,[13] not mental retardation. N.T. PCRA Hearing, 1/14/10, at 557–58; N.T. PCRA Hearing, 1/15/10, 657, 673–74.

Dr. Marston has been a licensed psychologist for the past 15 years, and is certified in cognitive and behavioral psychology. N.T. PCRA Hearing, 1/14/10, at 513–14. He owns a clinical and forensic psychology practice, which primarily focuses on adolescents and adults. *Id.* Dr. Marston administered the Vineland Adaptive Behavior Scales test to appellee. *Id.* at 537.[14] According to Dr. Marston, appellee scored low in the receptive communication portion; however, his daily living skills and motor skills were "average," and no score was given on socialization because he gave too many "I don't know" answers. *Id.*, at 538–41. Although appellee had some impairment in the areas of social/interpersonal skills, community resources, self-direction, functional academics, leisure, and health and safety, none were classified as significantly impaired. *Id.*, at 550–51. Although he did not note it in his reports, Dr. Marston believed appellee was attempting to exaggerate some of his limitations. *Id.*, at 573–75.

Dr. Marston also reviewed a number of appellee's medical records and test scores. He determined, based on Dr. Crown's WAIS–IV test, appellee's IQ score was 72, and was between 68 and 77 when weighed with its confidence intervals.

13. Borderline intellectual functioning is when a person's intellectual functioning is between mental retardation and an average IQ. *Id.*, at 528–29.

14. The Vineland test measures four categories of adaptive behavior: communication, daily living skills, socialization, and motor skills. *Id.*, at 537.

*Id.*, at 527. Dr. Marston explained this range of numbers spans between the higher range for mental retardation and the borderline intellectual functioning range. *Id.*, at 527–28. The score itself was in the borderline intellectual functioning range, which is between 71 and 85. *Id.*, at 529. Dr. Marston further testified appellee's one IQ score as a child, a 68 on the Stanford–Binet test, was also within the borderline functioning range, and Dr. Martell improperly concluded it was within the mentally retarded range. *Id.*, at 532–33. Dr. Marston conceded appellee's other two childhood IQ scores ranked within the mentally retarded range. *Id.* However, Dr. Marston further explained emotional instability, such as anxiety in school or problems at home, could have affected appellee's IQ scores. *Id.*, at 534.

The Commonwealth's second expert witness, Dr. Wright, is a licensed psychiatrist who owns his own practice. N.T. PCRA Hearing, 1/15/10, at 652–53. He is the medical director at St. Clair Hospital and is board certified in general adult psychiatry and geriatric psychiatry. *Id.* Dr. Wright was initially employed to interview appellee after his first homicide charge in 2001. *Id.*, at 655–56. At this point, Dr. Wright determined appellee had antisocial personality disorder, paranoid personality traits, borderline to low-average intellectual ability, and a presumed learning disability. *Id.*, at 657. During appellee's most recent homicide investigation, Dr. Wright agreed with Dr. Marston's conclusion that appellee did not meet the criteria for mental retardation, but was considered in the borderline intellectual functioning range. *Id.*, at 661.

Dr. Wright also found appellee did not have significant impairments in adaptive functioning such as communication, self-care, home living, self-direction, and health and safety. *Id.*, at 666. He went on to describe how well appellee's communication skills were when he spoke to police. Appellee was able to understand the questions asked and answered them properly. *Id.*, at 667. Also, appellee was competent in self-care and home living. *Id.*, at 667–68. Information available at appellee's sentencing described him as in charge of the house—running the home, paying the bills, caring for his

children, preparing family meals, and engaging in home maintenance. *Id.* Appellee also made the meals during the holidays and entertained at parties. *Id.* Concerning self-direction, Dr. Wright testified appellee is a hard worker, has worked hard since age ten, and has held several jobs in order to provide for his family. *Id.*, at 670–71. Although appellee was illiterate, he was still able to work as a disc jockey and navigate through his day-to-day life. *Id.* Regarding health and safety, Dr. Wright explained appellee's refusal of treatment was based on his fear of being experimented upon; he could possibly be suffering from a psychotic condition rather than mental retardation. *Id.*, at 671. Thus, he found appellee had sufficient adaptive functioning skills. *Id.*, at 672–73. Accordingly, Dr. Wright concluded, although appellee has some intellectual deficiencies and may have organic brain problems, there was no reliable information to establish appellee is mentally retarded. *Id.*, at 673–74, 714.

The defense also presented several lay witnesses, including a fellow death row inmate, penalty phase defense counsel, appellee's brother, a former employer, a former employer's spouse, a former co-worker, appellee's brother's girlfriend, and appellee's son. They testified appellee has difficulty communicating, understanding complex ideas, and following simple directions; they also mentioned he is illiterate. Appellee's brother testified regarding the severe abuse he endured by their father, including one instance of being thrown out of a second floor window, as well as his inability to socialize.

After hearing the testimony, the PCRA court determined appellee has an IQ between 70 and 75, placing him in the range of mild mental retardation, and his mental retardation was present well prior to the age of 18. PCRA Court Opinion, 4/15/10, at 11. The court also found appellee possesses significant limitations in adaptive functioning. The court reasoned appellee is illiterate, has only held simple minimum-wage jobs, requires frequent assistance from co-workers, is unable to handle money or manage his finances, was incapable of assisting his son with homework, cannot understand the serious nature of his medical conditions, has no social skills, and does

not understand social cues. *Id.* Thus, coupled with appellee's brain damage, severe childhood abuse, genetic predisposition to mental retardation, his mother's lack of prenatal care, and his poor nutrition during formative years, the court held appellee was mentally retarded as defined by both the DSM–IV and AAMR. *Id.,* at 11–12.

The Commonwealth contends the PCRA court erroneously determined appellee is mentally retarded pursuant to both the DSM–IV and AAMR. Specifically, the Commonwealth avers the court improperly considered appellee's childhood IQ scores, ranging from 59 to 68, because the childhood tests are not comparable with present tests—the childhood tests lacked an SEM and were culturally and racially biased, and past standards defining mental retardation differ from present standards. Moreover, appellee's severe childhood abuse likely affected his performance on his IQ tests, making them unreliable. The Commonwealth also contends appellee's adult IQ scores constitute borderline intellectual functioning, and thus are outside the diagnostic tests' range of mental retardation.

Even if appellee's IQ scores are within the DSM–IV or AAMR's acceptable range of mental retardation, the Commonwealth avers appellee does not possess the necessary major adaptive deficits to be considered mentally retarded because, as proven at trial, he was a functioning member of society, a strong parental figure, and an exemplary provider for his family. The Commonwealth also asserts the PCRA court erroneously found appellee's experts more credible than its experts, as the majority of appellee's experts never examined appellee for IQ or adaptive deficits. The Commonwealth also describes, in detail, appellee's murder of victim and his actions thereafter, including the intricacy of disposing of the body and complexity of his lies to avoid police suspicion.[15] Additionally, the Commonwealth cites testimony from appellee's family and

15. After murdering victim, appellee chopped off her head, feet, and hands, dumped the body on the side of a steep hill, and buried the extraneous parts in a junkyard. *See Williams,* at 442–44. Furthermore, when questioned by police, appellee responded that, because they were having marital issues, victim took her credit card along with $400 and left town. *Id.;* N.T. Trial, 1/22/02, at 76.

friends during the penalty phase in which they described appellee as the family's primary caregiver and recounted incidents of him loaning money to those in need. The Commonwealth then highlights the inconsistencies between this testimony and the same witnesses' affidavits stating appellee needed help in completing basic tasks. The Commonwealth concludes the evidence presented by appellee was unpersuasive in light of convincing and conflicting evidence, which showed he does not have the proffered adaptive deficits. Accordingly, the Commonwealth claims appellee's borderline intellectual functioning, along with credible evidence establishing appellee does not have substantial adaptive deficits, is insufficient to warrant his requested relief.

Appellee contends the Commonwealth ignores the applicable scope and standard of review, and when viewed in the light most favorable to him as the prevailing party, the evidence supports the PCRA court's finding of mental retardation. Appellee asserts the factual record clearly shows he is mentally retarded under the test articulated in *Miller*. He argues the multitude of tests used to determine his IQ, the resulting scores, and the majority of experts' reliance on the tests shows his IQ is within the mentally retarded range according to the AAMR and DSM–IV. Regarding his low score, he also posits the effort he put forth proves he was not malingering.

Further, appellee responds to the Commonwealth's assertion the childhood IQ tests were unreliable, asserting that even if the test results are one standard deviation lower for African–Americans, he would still be in the mentally retarded range according to the standards in effect at the time. Additionally, he points out the implications of the Commonwealth's argument—any African–Americans tested with the Stanford–Binet test in the 1960s would be denied protection under *Atkins* because their scores could be ignored; thus, they would essentially be prohibited from proving the third prong of the *Miller* test.

Next, appellee contends his significant deficits in adaptive functioning are well supported by the record, and the PCRA court's findings should not be disturbed. He also highlights

the Commonwealth's own expert witness's administration of the Vineland Adaptive Behavior Scales test, showing he had significant adaptive deficits.

Regarding *Miller's* third prong, appellee avers there is no dispute his impairments manifested at a very early age, as even the Commonwealth does not expressly challenge the existence of his impairments prior to age 18. He consistently tested in the mentally retarded range on his childhood IQ tests, was in special education until dropping out of high school, is illiterate, needed aid for speech problems, and had issues with health and safety. Thus, appellee asserts he is the "classic example" of a child with mental retardation.

Appellee also argues the PCRA court appropriately credited his experts' testimony over the Commonwealth's, and this Court may not reevaluate the credibility findings of the PCRA court. Appellee recites his experts' credentials and lack of expertise among the Commonwealth's experts. He argues his experts precisely followed the criteria for diagnosing mental retardation pursuant to the DSM–IV and AAMR, whereas the Commonwealth's experts persisted in defending their diagnosis of borderline intellectual functioning despite appellee's IQ clearly falling within the mentally retarded range and his significant impairments in adaptive testing.

Appellee also contends Dr. Marston was clearly biased and properly impeached on cross-examination for denying that an individual with an IQ score between 70 and 75 may be diagnosed with mental retardation, even when he was confronted with a verbatim reading of the DSM–IV text permitting such a diagnosis. *See* N.T. PCRA Hearing, 1/14/10, at 560. Appellee also describes Dr. Marston's misleading description of appellee's adaptive functioning scores in communication as "low," failing to mention the test showed appellee's communication skills were in fact significantly impaired. Appellee also points out the Commonwealth erroneously categorizes his "daily living skills" as average, even though Dr. Marston found there were significant limitations in that area of functioning. Furthermore, appellee notes the Commonwealth's expert did not assess his skills in the areas of

community resources, self-direction, functional academic skills, leisure, and health and safety; he argues the Commonwealth inaccurately implies he scored average in those categories.

Appellee further asserts Dr. Wright was properly discredited as well. Dr. Wright's sole reason for disregarding appellee's childhood IQ scores was that the Stanford–Binet test was outside cultural norms, making it unreliable for African–Americans. Appellee points out the treatise that Dr. Wright relied upon for his assertion removed the criticism from its most recent edition. Additionally, appellee asserts Dr. Wright admitted he incorrectly discounted the existence of any adaptive deficits because appellee tried to care for the household, hold a job, and cook for his family, as it was contrary to a treatise entitled *Comprehensive Textbook of Psychiatry*.

Additionally, appellee asserts the Commonwealth experts cannot isolate an IQ score to diagnose him with borderline intellectual functioning, as one must also consider his earlier scores, which are much lower. Appellee also refutes the Commonwealth's conclusion that his home environment contributed to his poor IQ score, as Dr. Kessel specifically rejected such a hypothesis.

Appellee asserts our question for review was to specifically address whether his intellectual functioning meets the diagnostic criteria for mental retardation, not whether his IQ scores were within the range of mental retardation. Additionally, appellee contends the Commonwealth's allegation the PCRA court failed to consider the record as a whole is simply erroneous because the court, which presided over appellee's trial, sentencing, and PCRA evidentiary hearing, heard testimony from all expert and lay witnesses, and properly determined by a preponderance of the evidence appellee is mentally retarded. Accordingly, as this Court is bound by the PCRA court's factual findings and must view the evidence in the light most favorable to the prevailing party, appellee contends the Commonwealth has provided no valid reason to overturn its ruling.

■ We must determine whether there is substantial evidence to support the PCRA court's finding appellee established, by a preponderance of the evidence, that he is mentally retarded according to the AAMR and DSM–IV definitions adopted in *Miller*. With regard to limited intellectual functioning, appellee was administered IQ tests throughout his life. At age eight, he scored 68 on the Stanford–Binet test, 64 on the same test at age 12, and 59 on the same test at age 15. As an adult, appellee scored 81 on the Wechsler Abbreviated Scales of Intelligence in February, 2000, as stipulated by Drs. Wright, Marston, and Martell; however, the test cannot be used diagnostically because it is solely a screening tool. *See* N.T. PCRA Hearing, 1/12/10, at 35, 138; N.T. PCRA Hearing, 1/14/10, at 531; N.T. PCRA Hearing, 1/15/10, at 662. Appellee also scored 76 on the WAIS in September, 2000; however, the expert who administered the exam rendered the score unreliable because of the significant scatter in subscores. *See* N.T. PCRA Hearing, 1/12/10, at 25, 136. In his most recent IQ test, appellee scored 72 on the WAIS–IV. Averaging all of appellee's IQ tests, Dr. Martell found his IQ score was 71.6, considering group and non-reliable testing methods, and 67.8 over his entire life. Dr. Musser found appellee's IQ was between 70 and 75. Drs. Crown, Kessel, and Marston found appellee's overall IQ was 72. Foregoing a definitive IQ score, Dr. Wright believed appellee has low to borderline mental retardation. After hearing this testimony and reviewing appellee's records, the PCRA court held appellee's IQ was between 70 and 75, placing him in the mild mental retardation range, which was sufficient to find appellee satisfied the first prong of the *Miller* test.

Turning to the second prong, the PCRA court heard ample evidence to support the conclusion appellee has significant deficits in adaptive functioning. Dr. Martell found appellee was deficient in seven of the 11 skill areas of the DSM–IV and deficient in all three areas under the AAMR standard. Dr. Crown found appellee had significant subaverage intellectual functioning under both classifications. Drs. Toomer and Musser found appellee was deficient in eight areas under the

DSM–IV and in all three areas under the AAMR. In contrast, Dr. Marston testified although appellee showed some impairment in the AAMR's areas, none of the impairments were significant, and his impairment in only one area of the DSM–IV's definition was sufficiently low enough to be significant. Dr. Wright found appellee had sufficient adaptive functioning skills. Lay witnesses also testified regarding appellee's life experiences, including his inability to read, perform basic job-related tasks, handle finances, assist his son with homework, and take care of his diabetes. The PCRA court was free to find appellee's experts credible, as there was sufficient evidence to find appellee has significant limitations in adaptive functioning, and the fact the court chose to give greater weight to these witnesses' testimony is not a reason to reverse its ruling. *See Commonwealth v. White,* 557 Pa. 408, 734 A.2d 374, 381 (1999) (where record supports PCRA court's credibility determinations, they are binding on reviewing court) (citations omitted).

Additionally, the PCRA court was capable of finding appellee is mentally retarded although he is the main provider for his family and able to hold basic jobs. As expressed by several of appellee's experts, the focus should be on an individual's weaknesses—not his or her strengths—as mentally retarded people can function in society and are able to obtain and hold low-skilled jobs, as well as have a family. This is represented in the DSM–IV and AAMR's definitions by an individual's classification as mentally retarded even though he may have relatively strong skills in distinct categories. Thus, the Commonwealth's assertion the PCRA court erred in finding appellee has significant adaptive deficiencies because he provides for his family and is capable of working is erroneous. Furthermore, the PCRA court's determinations regarding the credibility of witnesses will not be disturbed, as its factual findings are supported by substantial evidence; thus, the Commonwealth's assertion the PCRA court erroneously credited appellee's experts over its own ignores our standard of review. We conclude the evidence supports the PCRA court's finding that appellee met his burden of establishing *Miller's* second prong by a preponderance of the evidence. Turning to

the third prong of the *Miller* test, all of appellee's witnesses expressly stated his mental retardation was present well before he reached the age of 18. The Commonwealth's witnesses denied appellee was mentally retarded in general and questioned the Stanford–Binet test's reliability. As a child, appellee was placed in special education, was unable to form social relationships, was continuously bullied, and had issues with his health and safety. Relying heavily on the Stanford–Binet test and considering appellee's various childhood problems, the PCRA court found his childhood IQ scores were reliable, and determined appellee's mental retardation was present prior to age 18.

■ The Commonwealth's contention the PCRA court erroneously relied on the Stanford–Binet test is meritless. The treatise the Commonwealth's expert relied on in asserting the test was unreliable subsequently eliminated such concerns in its latest version. Further, the test's results are currently accepted and clinically relied upon in the scientific community. Thus, because the test is the best available evidence to review appellee's intellect as a child, and is relied upon in the scientific community, it was properly considered by the PCRA court in determining whether appellee satisfied the third prong of the *Miller* test. We conclude the evidence supports the PCRA court's finding this prong was met by a preponderance of the evidence.

Accordingly, given the testimony from numerous experts and lay witnesses, as well as various records documenting appellee's IQ and limited adaptive functioning, the PCRA court's determination appellee established, by a preponderance of the evidence, that he is mentally retarded is supported by substantial evidence, and it properly vacated his death sentence.

Order affirmed. Jurisdiction relinquished.

Justice ORIE MELVIN did not participate in the consideration or decision of this case.

Chief Justice CASTILLE, Justice SAYLOR and BAER, Justice TODD and Justice McCAFFERY join the opinion.