**[J-73-2013] [MO: Stevens, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : No. 675 CAP |
| | : |
| Appellant | : Appeal from the Order entered on |
| | : 06/28/2012 in the Court of Common |
| | : Pleas, Criminal Division of Philadelphia |
| v. | : County at No. CP-51-CR-0933912-1986 |
| | : |
| | : |
| RICHARD HACKETT, | : |
| | : SUBMITTED: August 29, 2013 |
| Appellee | : |

**DISSENTING OPINION**

**MR. JUSTICE BAER**                **DECIDED: August 18, 2014**

Following a hearing on the Atkins[1] claim brought by Richard Hackett (Appellee), which required Appellee to prove, by a preponderance of the evidence, that he is mentally retarded pursuant to the standard adopted by this Court in Commonwealth v. Miller, 888 A.2d 624 (Pa. 2005), the PCRA court granted relief. Because the court accepted Appellee's evidence, and rejected the contrary evidence proffered by the Commonwealth, it found that Appellee met the appropriate definitions of mental retardation set forth in Miller and, therefore, is ineligible for the death penalty. The Majority reverses, concluding that the record does not support the lower court's factual

---

[1]    See Atkins v. Virginia, 536 U.S. 304 (2002).

findings. Respectfully, its conclusion is simply unsupportable under the appropriate standard of review on appeal. The PCRA court heard from five experts. Four of them offered their opinions that, to a reasonable degree of scientific certainty, Appellee is mentally retarded. One opined that he was not. This evidence was accompanied by other testimony that, to varying degrees, supported or undermined their expert opinions. After listening for six days, the PCRA court docketed a thoughtful nineteen page opinion replete with careful citations to the record concluding that Appellee's experts and other testimony were more credible than that presented by the Commonwealth. The PCRA court could have reached the opposite conclusion because, as recognized by the Majority, there was evidence of record to support either a finding of mental retardation or "dull normal" functioning. However, once the PCRA court, after listening to the five experts and six days of testimony, adjudged credibility and reached its decision, this case, at least on this issue, was over. The Majority herein inexplicably fails to recognize that the evidence it relies on in reversing the PCRA court has already been considered and rejected by the fact-finder. The Majority's re-weighing of the evidence constitutes an abuse of our appellate standard of review.[2] I am thus compelled to adamantly dissent. To make my point, I have reviewed all of the evidence and then, seriatim, the various points discussed by the Majority.

---

[2] Although I acknowledge the position set forth by the Chief Justice in his concurring opinion regarding his frustration with the Federal Community Defender's Office and their litigation strategies in capital cases, I respectfully believe that his Concurring Opinion, like the Majority herein, has disregarded the most basic facet of appellate review: that we are bound by the factual and credibility determinations of the PCRA court where those findings are supported by the record.

The U.S. Supreme Court has barred the execution of mentally retarded persons. Atkins, 536 U.S. 304. In Miller, 888 A.2d 624, we adopted the criteria for diagnosing mental retardation, which is now more commonly referred to as intellectual disability, that is used by the American Association on Intellectual and Developmental Disabilities (AAIDD) (previously, the American Association on Mental Retardation (AAMR)) and the American Psychiatric Association. Under these criteria, as set forth in Miller, the following requirements must be met for a finding of mental retardation: 1) limited intellectual functioning; 2) significant adaptive limitations; and 3) onset of the condition before the age of 18. Miller, 888 A.2d at 630.[3] To be considered mentally retarded, or intellectually disabled, a petitioner must prove these three criteria by a preponderance of the evidence. Id. at 631.

The PCRA court in this case properly applied the standard we established in Miller and concluded that Appellee met the definition of mental retardation. Thus, the

---

[3]    As we explained more fully in Miller:

[O]ur analysis of this issue must begin with the proper definition of "mental retardation" for purposes of the application of Atkins in Pennsylvania. The United States Supreme Court cited two different definitions of "mental retardation" in Atkins, and we will first consider these definitions. The AAMR defines mental retardation as a "disability characterized by significant limitations both in intellectual functioning and in adapative behavior as expressed in the conceptual, social, and practical adaptive skills." Mental Retardation at 1. The American Psychiatric Association defines mental retardation as "significantly subaverage intellectual functioning (an I.Q. of approximately 70 or below) with onset before age 18 years and concurrent deficits or impairments in adaptive functioning." DSM-IV at 37. Thus, as noted by the PCRA court, both definitions of mental retardation incorporate three concepts: 1) limited intellectual functioning; 2) significant adaptive limitations; and 3) age of onset.

888 A.2d at 629-30.

only question before us on appeal is whether the PCRA court erred in reaching this conclusion based on the evidence presented. In this regard, "our standard of review of the PCRA court's determination regarding whether a petitioner is mentally retarded is a mixed question of law and fact," which we have described as follows:

> A question involving whether a petitioner fits the definition of mental retardation is fact intensive as it will primarily be based upon the testimony of experts and involve multiple credibility determinations. Accordingly, our standard of review is whether the factual findings are supported by substantial evidence and whether the legal conclusion drawn therefrom is clearly erroneous. We choose this highly deferential standard because the court that finds the facts will know them better than the reviewing court will, and so its application of the law to the facts is likely to be more accurate.

Commonwealth v. Williams, 61 A.3d 979, 981 (Pa. 2013) (quoting Commonwealth v. Crawley, 924 A.2d 612, 616 (Pa. 2007)).

Our review of the grant of post-conviction relief is limited to an examination of whether the PCRA court's determination is supported by the record and free from legal error. Commonwealth v. Moore, 805 A.2d 1212, 1214 n.1 (Pa. 2002). We cannot disturb the factual findings of the PCRA court, which hears evidence and passes on the credibility of witnesses, if they are supported by the record, even where the record could support contrary findings. Commonwealth v. Jones, 912 A.2d 268 (Pa. 2006). Additionally, our "scope of review is limited to the findings of the PCRA court and the evidence on the record of the PCRA court's hearing, viewed in the light most favorable to the prevailing party." Commonwealth v. Duffey, 889 A.2d 56, 61 (Pa. 2005). Accordingly, if the PCRA court's determinations with regard to Appellee's Atkins claim are supported by the record and free from legal error, we are bound by them, even where our reading of the record also reveals support for contrary findings.

Regarding the first criteria, which is whether Appellee demonstrated limited intellectual functioning by a preponderance of the evidence, the PCRA court found that he had. In my view, this factual finding is supported by the record and free from legal error. Dr. Barry Crown, an expert in clinical and forensic psychology and neuropsychology with decades of experience in treating patients with mental retardation, tested Appellee on July 22, 2009, on the Wechsler Adult Intelligence Scale (WAIS), which the Commonwealth expert, Dr. Paul Spanger, agreed was the "gold standard" of individually administered tests. Notes of Testimony (N.T), Atkins Hearing, 11/16/2011, at 61. Appellee scored an I.Q. of 57, with underlying scores in verbal comprehension (74), perceptional reasoning (65), working memory (58), and processing speed (53), which each fell below the threshold score of 75 and within the defined range of sub-average intellectual functioning.[4]

In addition to administering the I.Q. test, Dr. Crown reviewed the facts of the case and the evidentiary exhibits, talked to Appellee's prior trial counsel, and opined that, based on his review of this information, Appellee was mildly mentally retarded. N.T., Atkins Hearing, 5/11/2011, at 53 ("With regard to his IQ, his intelligence quotient, which is prong one of the definition, he certainly falls within the guidelines and the diagnostic criteria for intellectual disability or mental retardation."). Continuing, Dr. Crown stated that Appellee's I.Q. of 57 placed him "below the first percentile" of the population. Id. at 63.

---

[4]    We explained in Miller that limited intellectual functioning is best represented by I.Q. scores which are approximately two standard deviations (or 30 points) below the mean (100), and provided that "a subaverage intellectual capability is commonly ascribed to those who test below 65-75 on the Wechsler scales." 888 A.2d at 630.

Further noting the homogeneity[5] on Appellee's subscale scores, Dr. Crown testified that he found no reason to believe Appellee's score was the result of malingering or fraud, and explained that there were specific indicators of malingering which were not present with Appellee. N.T., Atkins hearing, 5/11/2011, at 64 ("And in people who are retarded or intellectually disabled, there should be a great deal of homogeneity. In addition, in my clinical interview, he was forthright and forthcoming. There was nothing to suggest that he was attempting to fake this.") Dr. Crown also testified that his opinion about Appellee's sub-average intellectual functioning was supported by several other factors, including Appellee's early academic history: he repeated the first grade three times and struggled with reading; he had genetic links to mental deficiency as exhibited by his father and brother; he was exposed to toxins at an early age; he engaged in boxing; and he had difficulty understanding the concepts of his defense at his criminal trial.

Dr. Daniel Martell, a forensic psychologist and assistant clinical professor in the Department of Psychiatry and Behavioral sciences at UCLA's School of Medicine, agreed with Dr. Crown that Appellee is mentally retarded. N.T., Atkins Hearing, 5/12/2011, at 32-33 (explaining that based on all of the data on Appellee, including three IQ test scores from when Appellee was a child, "[h]e clearly has a significantly subaverage intellectual function and I believe it's real and I believe it's true."). Dr. Martell testified that there is a way to test for malingering, referred to as the Mittenberg Index, and that Appellee's score of 57 remained valid after applying the index. Id. at 17;

---

[5]     In this context, "homogeneity" refers to logical consistency. Thus, Appellee's sub-scores indicated internal consistency, which would be expected for one who is mentally retarded, rather than one who is attempting to fool the tester.

id. at 18 ("My conclusion is that he was not malingering. That those data are, in fact, valid and it's a real score."); id. ("He was not malingering for Dr. Crown. He was not malingering for Dr. Armstrong. There's no evidence in the record that he has malingered on any of these tests.").

Dr. John O'Brien, a psychiatrist, evaluated Appellee and reviewed the records and conclusions of other experts, and concluded that Appellee met the diagnostic criteria for mental retardation. N.T., Atkins Hearing, 5/12/2011, at 177-178. Finally, Dr. Carol Armstrong, a neuropsychologist and defense expert, conducted a clinical interview of Appellee and administered forty-five neuropsychological subtests to him, which assessed his memory processes, reasoning, judgment, verbal abilities, ability to perform different tasks, and included two parts of the I.Q. test given by Dr. Crown. N.T., Atkins Hearing, 11/15/2011, at 90-93. She testified that Appellee has significant sub-average intellectual functioning, id. at 111, and that the results she received substantiated Dr. Crown's reported I.Q. score of 57. Id. at 93; 98. Additionally, Dr. Armstrong testified that Appellee was not malingering. Id. at 94-95. She observed that Appellee had neuro-psychological problems at birth, and that his subsequent exposure to toxins as a child and through adulthood, as well as head injuries, hampered the growth of his brain. Id. at 104-06.

The PCRA court relied on the testimony of Drs. Crown, Martell, O'Brien, and Armstrong, as well as testimony from Appellee's family regarding his assistance in the family's puppy kennel from the age of ten to eighteen, which involved the use of multiple toxins several times a year, testimony about Appellee's lawn care business, which involved his use of pesticides without the benefit of a respirator or protective clothing,

and testimony about Appellee's involvement in a boxing club for a year when he was fourteen. It concluded, based on the evidence and the experts' opinions, that Appellee demonstrated sub-average intellectual functioning.

In reaching this conclusion, the PCRA court considered and rejected the testimony of the Commonwealth's expert, Dr. Spangler, an expert in developmental and intellectual disability, who reviewed Appellee's elementary school and hospital records, and concluded that Appellee's I.Q. was in the range of "dull normal" rather than mental retardation. N.T., Atkins Hearing, 11/17/2011, at 12. Dr. Spangler's conclusion in this regard derived primarily from three prior I.Q. tests administered to Appellee: a 1972 test administered by St. Christopher's school, with a score of 80; a 1979 test administered by the Counseling or Referral Assistance Services (CORA), with a score of 85; and a 1988 Beta-2 screening test administered by prison officials, with a score of 82.

In directly comparing the parties' lead experts, the PCRA court found Dr. Spangler's conclusion less credible than that of Dr. Crown premised on its observations that Dr. Spangler did not personally interview Appellee or administer any developmental or I.Q. tests and did not dispute the validity of the test administered by Dr. Crown. Additionally, the court noted that Dr. Spangler agreed with Dr. Crown, as well as all of the other defense experts, that there was no significant malingering by Appellee on Dr. Crown's test. N.T., Atkins Hearing, 11/17/2011, at 27 (stating that Appellee did not purposefully give false answers); id. at 34 ("I don't think he's actually lying."); id. at 151 ("I didn't feel there was significant malingering."). The PCRA court also observed Dr. Spangler's testimony that Appellee's motivation may have caused him to work more slowly on Dr. Crown's test, and therefore may have depressed his score by up to fifteen

points. PCRA Ct. Op. at 7. Even by this measure, however, Appellee's score remained in the range for mental retardation (72).

The PCRA court was not persuaded by Dr. Spangler that Appellee's three earlier, higher I.Q. test results indicated that Appellee was not mentally retarded, accepting instead Appellee's experts' explanations about why these earlier tests were not persuasive on the factual question of whether Appellee suffers from limited intellectual functioning. The record supports the PCRA Court's acceptance of Appellee's experts' opinions instead of the Commonwealth's in this regard.

Specifically, the PCRA court noted Dr. Crown's testimony that these three scores did not change his opinion that Appellee was mentally retarded. PCRA Ct. Op. at 8; N.T., Atkins Hearing, 5/11/2011, at 84 (referring to the 1979 test and stating that it did not alter his opinion about whether Appellee meets the intellectual functioning prong). Specifically, Dr. Crown explained that none of the three prior tests altered his opinion that the 2009 I.Q. test, with a score of 57, represented Appellee's I.Q. because, with regard to the 1972 test administered by St. Christopher's school and the 1979 test administered by CORA, there was no information about the circumstances in which the test was administered, who administered it, whether it was a full or partial test, or how it was scored. Id. at 84 (referring to the 1972 test and stating that, from the report of the score, he could tell nothing about the circumstances in which the test was administered or by whom); id. at 84-85 (stating that as a clinician, he was unable to rely on the score reported from the 1972 test in assessing Appellee's intellectual functioning); id. at 82 (referring to the 1979 test and explaining "I don't know how it was administered. I don't even know whether it was -- the whole WISC or whether it was a partial WISC, which is

very common in school systems. And I'm not sure who actually administered it. That report is signed by two people. One is a PhD and the other person has a master's degree."); id. at 84 (explaining that 1979 test did not alter his view of Appellee's intellectual functioning because "a child's development can change from year to year. So that's just one point in time."). Dr. Crown testified that with respect to the 1972 test results, it was not even clear what test was administered. Id. at 84.

Turning to the 1988 test, Dr. Crown explained that the Beta-2 test is not generally utilized to diagnose mental retardation and should not be relied upon in assessing intellectual functioning; rather, it is meant to yield an approximate I.Q. Id. at 80-81. Additionally, the Beta-2 scores do not correlate with WAIS scores, producing instead results that are approximately fifteen points higher than WAIS scores, so that Appellee's score on the Beta-2 of 82 was consistent with his 2009 WAIS score of 57 because it revealed that Appellee was in the lowest 1% of population. Id. at 81 ("At the tails of the distribution, the disparity is roughly 15 points from the Wexler scale. . . . [Appellee] is at the tail of the distribution. 99 of 100 people would be ahead of him. He's at the lowest, lowest point in that bell-shaped curve.").

The PCRA court further noted that Dr. Martell also testified that nothing about Appellee's older I.Q. test scores altered his opinion about Appellee's sub-average intellectual functioning. PCRA Ct. Op. at 10; N.T., Atkins Hearing, 5/12/2011, at 33. Specifically, Dr. Martell agreed with Dr. Crown with respect to the Beta-2 test. He explained that it is outdated, inaccurate, and tests specific non-verbal abilities rather than overall I.Q. N.T., Atkins Hearing, 5/12/2011, at 29-30. He further testified that whoever scored the test did so incorrectly, so that in Dr. Martell's opinion the score

reported from the Beta-2 test should have been 74. Id. at 31. In addition, according to Dr. Martell, the Beta-2 test overestimates one's real I.Q. by ten to fifteen points, bringing the Beta-2 score more in line with the 2009 test administered by Dr. Crown. Id. at 31-32.

Regarding the 1972 and 1979 tests, Dr. Martell did not dispute their validity, but opined that these tests could not account for subsequent "neurological insults" that Appellee endured as an adolescent and young adult. PCRA Ct. Op. at 8-9; N.T., Atkins Hearing, 5/12/2011, at 19-20 ("I think those scores [referring to the 1972 and 1979 scores] can be legitimate. . . . But there is significant events in his history after age 14 where he was receiving head injuries and where he was chronically exposed to poisons that attacked the nervous system . . . ."). Explaining that the battery of tests given to Appellee by Dr. Armstrong were neuropsychological, and designed to look at the specific functions of each lobe of the brain, Dr. Martell testified that the results of such tests corroborated his testimony about neurotoxin exposure. Id. at 27; id. at 28 (". . . the pesticides are known to affect certain brain functions and those are the areas in which he has particularly poor performance.").

The PCRA court additionally relied on Dr. O'Brien's testimony that Appellee's older I.Q. test results did not change his opinion that Appellee's I.Q. indicated limited intellectual functioning. PCRA Ct. Op. at 10; N.T., Atkins Hearing, 5/12/2011, at 178; id. at 180 ("the more current assessment [of I.Q.] is more relevant [than the older tests].") Further, Dr. O'Brien testified that the Beta-2 test was unreliable for the reasons already stated by Drs. Crown and Martell, id. at 183-84, and that without the raw data relating to Appellee's early I.Q. tests, the test results themselves were not reliable. Id. at 184

("[W]ithout the raw data with the prior testing, we're really not in a position to assess whether or not that testing result was in fact accurate. . . . we really don't know if that's an accurate result.").

Finally, the PCRA court relied on the testimony of Dr. Armstrong that the I.Q. scores obtained during Appellee's childhood and adolescence were not as reliable as that obtained by Dr. Crown. PCRA Ct. Op. at 11. Specifically, Dr. Armstrong discounted the reliability of the older tests for two reasons: because no one could verify their accuracy due to the lack of data about the testing process, and because those tests occurred prior to Appellee's involvement with the sport of boxing and exposure to neurotoxins. N.T., Atkins Hearing, 11/15/2011, at 109 (explaining that there was no way to verify whether the prior tests were "done correctly."); id., at 108 ("Well, the IQ that he had prior to his . . . chemical exposure and the boxing seem like anomalies compared to the rest of his history, as well as the neurological findings, the I.Q. of Dr. Crown in 2009."); id. at 110 (". . . as I put his information together, [the older I.Q. test scores] stand out as outliers and -- so, either there's something wrong with them or the history explains that they actually declined after that.").

Based on the preponderance of the evidence standard, the evidence in the record and the testimony relied upon by the PCRA court in its opinion supports its conclusion that Appellee met the constitutional standard of limited intellectual functioning. Both Appellee and the Commonwealth presented evidence, and the PCRA court made the necessary factual and credibility determinations to decide whether Appellee met his burden of proof. It accepted Appellee's evidence, and rejected the Commonwealth's. Because its finding of Appellee's limited intellectual functioning is

supported by the record, there is no basis upon which to set aside the PCRA court's factual findings; rather, we should uphold it, and should not search the record for contrary evidence that supports the Commonwealth.

Rather than examine the record to discern whether it supported the PCRA court's determinations, the Majority has, in my respectful opinion, reweighed the evidence and substituted its judgment for that of the fact finder. Such reweighing does not comport with our unassailable criteria for appellate review. See Commonwealth v. White, 734 A.2d 374, 381 (Pa. 1999) ("there is no justification for an appellate court, relying solely upon a cold record, to review the fact-finder's first-hand credibility determinations."). Nor does it comport with the "highly deferential" standard of review employed in cases where an Atkins claim is raised. See Crawley, 924 A.2d at 616. In Crawley, we explained that the question of whether a petitioner fits the definition of mental retardation is fact intensive because it is primarily based on the testimony of experts and involves multiple credibility determinations; thus, we will uphold the factual findings where they are supported by substantial evidence and we will uphold the legal conclusions drawn therefrom unless clearly erroneous. Id. "We choose this highly deferential standard because 'the court that finds the facts will know them better than the reviewing court will, and so its application of the law to the facts is likely to be more accurate.'" Id. (quoting Thomas v. General Motors Acceptance Corp., 288 F.3d 305, 307–08 (7th Cir. 2002)).

By reweighing the credibility of Appellee's expert, the Majority and the Chief Justice in concurrence have, respectfully, disregarded the evidentiary value of expert opinion, which, when rendered to a reasonable degree of professional certainty, is

sufficient to support a finding of fact.  See, e.g., McMahon v. Young, 276 A.2d 534, 535 (Pa. 1971) ("The opinion of a medical expert is evidence. If the fact finder chooses to believe it, he can find as fact what the expert gave as an opinion."); Commonwealth v. Meals, 912 A.2d 213 (Pa. 2006) (same).  When Appellee's psychiatric experts testified to a reasonable degree of medical certainty that Appellee met the clinical definition of intellectual disability, therefore, Appellee had presented evidence sufficient to permit the PCRA court to find as much.

In an analogous context, we reviewed the Superior Court's reversal of a trial court's order concluding that the appellee suffered from pedophilia, and, consequently, was a sexually violent predator under Megan's Law, 42 Pa.C.S. §§ 9791 *et seq*.  Meals, 912 A.2d at 214.  In rejecting the Superior Court's analysis, we disapproved of its conclusion that expert opinion was insufficient to support the trial court's finding of pedophilia:

> The [Superior Court's] discounting of the finding of pedophilia is also troubling because it ignores that [the] expert opinion -- that, to a reasonable degree of professional certainty, appellee was a pedophile -- itself was evidence. To the extent appellee felt that the expert's "diagnosis" was not fully explained, did not square with accepted analyses of the disorder, or was simply erroneous, he certainly was free to introduce evidence to that effect and/or to argue to the factfinder that the Commonwealth's expert's conclusions should be discounted or ignored. But that argument would affect the weight, and not the sufficiency, of the expert's evidence. See, e.g., Commonwealth v. Davido, 582 Pa. 52, 868 A.2d 431, 442 n. 18 (2005); cf. McMahon v. Young, 442 Pa. 484, 276 A.2d 534, 535 (1971) ("The opinion of a medical expert is evidence")

Meals, 912 A.2d at 223-24.

To the extent the Commonwealth, the Majority, and the Concurring Opinion challenge the PCRA court's decision crediting Appellee's expert opinions based on

credibility, that view is relevant to the weight of the evidence or even the admissibility of that evidence. See Pa.R.E. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted."). Once the evidence was properly admitted, however, pursuant to McMahon and Meals, the PCRA court was within its discretion to "find as a fact what the expert gave as an opinion." McMahon, 276 A.2d at 535. For instance, turning to the PCRA court's specific factual findings relative to the first criteria of low intellectual functioning, the Majority accuses the PCRA court of "dismissing" Appellee's pre-Akins I.Q. scores because the Commonwealth was unable to prove the veracity or accuracy of the earlier tests, and asserts that the Commonwealth is not required to do so because it is Appellee's burden to prove mental retardation. Maj. Slip Op. at 33. The PCRA court, however, did not dismiss Appellee's pre-Atkins scores; it considered them and found them less reliable as an accurate indicator of Appellee's intellectual functioning than the 2009 test administered by Dr. Crown and the other evidence presented by Appellee. Moreover, it did not make this determination based on the Commonwealth's failure to verify the accuracy of the tests; it considered the lack of supporting data about the testing conditions as pointed out by defense testimony and accepted the proffered proposition that the most recent I.Q. test was the most reliable. The court also relied on Dr. Martell's and Dr. Armstrong's conclusions that Appellee's exposure to neurotoxins and involvement in boxing subsequent to the pre-Atkins I.Q. tests also added to the decline in his I.Q. score.

While it is unequivocal that Appellee bears the burden of proving his mental retardation, the burden is by a preponderance of the evidence. The PCRA court found that Appellee factually met this burden notwithstanding higher scores on earlier I.Q. tests because it credited the testimony of Appellee's experts. These are factual and credibility determinations to which we are bound, and I see no basis to set aside such determinations as they are supported by the record.

Apparently arguing in the alternative, the Majority notes that defense experts did not claim that Appellee's 1972 and 1979 scores were inaccurate, but merely stated they were unreliable because of the absence of supporting information. Maj. Slip Op. at 33. While the Majority is correct that the experts did not claim that the 1972 and 1979 tests were inaccurate, the salient point is that they, in their expert opinions, were not persuaded by these two scores to alter their opinions about Appellee's intellectual functioning. Drs. Crown and O'Brien explained their reasoning in this respect by observing the lack of information to substantiate the reliability of the reported scores, Drs. Martell and Armstrong hypothesized that these earlier tests were administered before subsequent events decreased Appellee's neurological functioning, and Dr. O'Brien opined that the most recent I.Q. test score was the most accurate representation of Appellee's present intellectual functioning. While the Commonwealth presented contrary evidence, the PCRA court credited Appellee's experts' opinions and accepted their assertions that the 1972 and 1979 tests were not the best indicator of Appellee's intellectual functioning.

Examining the testimony of Dr. O'Brien, the Majority finds an apparent contradiction in his reliance on the 2009 I.Q. test administered by Dr. Crown, even in the

purported absence of raw data attending that test. Maj. Slip Op. at 33. Dr. O'Brien, however, accepted the testimony of the other experts, including Dr. Crown, regarding the validity and reliability of the 2009 testing and scoring. N.T., Atkins Hearing, 5/12/2011, at 185 (". . . the reliability of that testing [referring to the 2009 test] was found to be intact."); id. at 186 (stating that he routinely relies on psychological testing that has been done by other psychologists and "subjected to the same type of reliability analysis that Dr. Martell undertook with the testing performed upon Mr. Hackett. In my opinion there's nothing to indicate that the testing is not reliable."). Unlike the Majority, I see no contradiction in this witness finding unpersuasive older tests for which there was no supporting data, and finding persuasive the most current test which several other experts had examined for administration, scoring, and reliability.

Further, Dr. O'Brien credited the score derived by Dr. Crown because it was the most recent in time, and therefore most relevant. N.T., Atkins Hearing, 5/12/2011, at 180. Dr. O'Brien also explained that he relied on Dr. Crown's score because the test that was administered is "the primary test utilized for the purposes of assessing intelligence in terms of determining if an individual meets the diagnostic criteria for mental retardation," and was therefore more reliable than other tests. Id. at 183. Additionally, Dr. O'Brien explained that the 1979 test administered by CORA was suspect because the purpose of that test was to determine if Appellee could be mainstreamed in special education within the public school system, and, despite resulting in a score of 85, which is above the range for mental retardation and suggests that mainstreaming was appropriate, the decision that followed was not to mainstream Appellee. Id. at 182.

The Majority next asserts that Appellee's own experts offered conflicting opinions with regard to whether the pre-Atkins scores were reliable: "[W]hile Dr. Crown refused to rely on Appellee's early I.Q. scores and Dr. Armstrong did not comment on the reliability of these tests, Dr. Martell felt Appellee's first two test scores, which were above the threshold of mental retardation, were reliable." Maj. Slip Op. at 33. This assertion, however, misses the point. Dr. Martell did not state that the older tests were reliable; he stated that he did not care and therefore would not opine about their reliability because they were administered prior to the later events that, in his opinion, decreased Appellee's neurological functioning, specifically, boxing and exposure to neurotoxins. In relevant part, Dr. Martell testified as follows:

> I'm not going to quibble about those tests and those scores [referring to the older tests]. . . . I think those scores can be legitimate. He certainly had an 85 on that WISC in 1979 when he was 14-years old. But there is significant events in his history after age 14 where he was receiving head injuries and where he was chronically exposed to poisons that attacked the nervous system and were taken off the market. . . .

N.T., Atkins Hearing, 5/12/2011, at 19-20; id. at 64 ("There are unknowns about those tests. . . I'm not going to quibble about those scores. It's quite possible those are valid or at least close approximations to what his I.Q. was at that time."); id. at 66 ("I don't quibble with that [the 1979 score] because what I see is the big problem here occurred after that test."). It is apparent that Dr. Martell did not view the older tests as relevant, even if the 1979 score could be considered valid.

Next, the Majority asserts that there is no basis in the record for the PCRA court's finding that, according to Dr. Crown, Appellee's earlier test scores would have been "nullified" by factors such as "inconsistent testing conditions, wildly divergent

median ranges, and out-of-date testing measures (known as the 'Flynn effect')." Maj. Slip Op. at 33. Although the Majority is correct that Dr. Crown did not opine that the earlier tests were unreliable for these reasons, Dr. Crown explained other reasons for not being persuaded by the earlier tests, specifically, the lack of information about the circumstances of the test, and his belief that the most recent test was the most accurate indication of Appellee's intellectual functioning. The record supports the PCRA court's acceptance of Dr. Crown's expert opinion in this regard.

Although the Majority is factually accurate that Dr. Armstrong expressed an opinion that "the Flynn effect" should adjust Appellee's older scores downward because of outdated norms, but that such adjustments did not bring the scores into the range of mental retardation, this opinion was tangential to the doctor's testimony, which focused primarily on the neurological impact of events that transpired following the administration of the earlier tests. N.T., Atkins Hearing, 11/15/2011, at 184 (after explaining the Flynn effect, stating "[b]ut, as I said earlier, those scores which were . . . before the age of 18 . . . were taken before he had other insults to his brain. . .").

The Majority asserts that Appellee was never diagnosed as having mental retardation. This is incorrect, as all of Appellee's experts agreed that he has mental retardation. N.T., Atkins Hearing, 5/11/2011 at 53; id. at 56; id. at 65; id. at 79; id. at 92; id. 5/12/2011 at 56; id. at 60; id. at 144; id. at 178; id at 194; id. at 196; id. at 212; id. 11/15/2011 at 101; id. at 142; id. at 174; id. at 219. If the Majority is suggesting that the lack of a diagnosis of mental retardation prior to age 18 dooms a claim of mental retardation, Maj. Slip Op. at 34, with all due respect, we have never held that a formal diagnosis of mental retardation arising prior to age 18 is a criteria pursuant to Miller. To

the contrary, we have accepted evidence of diminished intellectual functioning and age of onset that fall short of a formal diagnosis arising before age 18. See, e.g., Williams, 61 A.3d 979 (affirming PCRA court's finding of mental retardation in the absence of a childhood diagnosis of mental retardation). While it would clearly be an easier case if Appellee had been diagnosed with mental retardation prior to turning eighteen, the PCRA court properly considered the evidence presented and the testimony of Appellee's experts, who diagnosed Appellee with mental retardation.

The Majority next asserts that Dr. Martell conceded that Appellee's label of "brain injured," which was how the Ashbourne school classified him, could have indicated Appellee merely had learning disabilities. Maj. Slip Op. at 34. Dr. Martell's testimony, however, also indicates that the term encompassed children with mental retardation. N.T., Atkins Hearing, 5/12/2011, at 75 ("Learning disability is a kind of brain damage. Mental retardation is a kind of brain damage. They don't necessarily result from brain injury but they reflect abnormal brain functioning."). Similarly, although the Majority characterizes the testimony of Dr. Armstrong as indicating that Appellee's mental impairment was consistent with other neurological abnormalities, it is clear from her entire testimony that in her opinion Appellee has mental retardation. Dr. Armstrong conducted a neurological assessment, involving a battery of 45 tests, and made overall findings, and concluded that Appellee has intellectual disability, which she explained is the current terminology to describe mental retardation, in accord with the three prongs adopted to define mental retardation in Miller. N.T., Atkins Hearing, 11/15/2011, at 96; id. at 101; id. at 135-36. The Commonwealth challenged her opinion on cross-examination, but she was consistent that, in her opinion as a neuropsychologist, looking

at the totality of the evaluations and reports, Appellee has mental retardation. Id. at 149-165.

The Majority is, I believe, unfairly critical of the PCRA court for not distinguishing between students with learning disabilities and those with mental retardation. The Commonwealth cross-examined Dr. Armstrong with regard to whether it was possible that all of Appellee's limitations could be ascribed to learning disabilities rather than mental retardation, and Dr. Armstrong explained that learning disabilities and mental retardation were not discreet categories, that someone who has mental retardation will likely also have learning disabilities. N.T., Atkins Hearing, 11/15/2011, at 158 ("And, yes, learning disability is not a -- some other diagnosis that's separate from intellectual disability or mental retardation. It's a part of it."). There is nothing in the PCRA court's opinion that betrays of lack of understanding in this regard. See PCRA Ct. Op. at 11 (referencing Dr. Armstrong's opinion that Appellee has an intellectual disability, or mental retardation).

Next, the Majority expresses skepticism of Dr. Crown's opinion that there was no indication that Appellee intentionally depressed his I.Q. score by a lack of effort. Maj. Slip Op. at 35. In this regard I would also note that Dr. Spangler, the only expert who did not believe that Appellant's I.Q. was in the range of mental retardation, rejected the score derived by Dr. Crown because he believed that Appellee's motivation to work slowly could have artificially depressed his score by about fifteen points. Thus, even by the Commonwealth's own speculation about this slow-down effect, Appellee's most recent I.Q. score indicates that it is still within the range of mental retardation, at 72 (the uncontested actual score of 57 plus 15). Moreover, the fact remains that Dr. Crown

testified that nothing the Commonwealth offered altered his opinion that there was no evidence of a lack of motivation with regard to the 2009 I.Q. test.  N.T., Atkins Hearing, 5/11/2011, at 177-178.

In particular, the Commonwealth played for Dr. Crown the recorded conversation in which Appellee indicated his intent to play the "nut role" and "beat the system," and Dr. Crown was still not persuaded to alter his opinion.  Id. at 176.  While the Majority may not agree with Dr. Crown, the fact remains that it was his expert opinion, as a neuropsychologist.  Moreover, it was bolstered by multiple other experts as well as lay witnesses.  The PCRA court was well within its discretion to consider credibility, and to accept this testimony.

The Majority also takes the PCRA court to task for not considering that there may be a powerful incentive to malinger and to slant evidence to establish mental retardation.  Maj. Slip Op. at 35-36 (citing Commonwealth v. DeJesus, 58 A.3d 62, 85-86 (Pa. 2012)).  Although "[t]he prospect of malingering and the incentive to slant evidence to influence a finding of mental retardation are relevant considerations to argue to the Akins factfinder in an appropriate case," id. at 85, there is no indication that the factfinder in this case failed to scrutinize such considerations.  The thrust of the Commonwealth's presentation of evidence with regard to Appellee's I.Q. score was that his prior I.Q. scores were more accurate indicators of his intelligence than the most recent test administered by Dr. Crown precisely because of Appellee's Atkins motivation to do poorly.  Every expert who testified, however, stated that Appellee was not malingering, and the only expert to speculate about Appellee's motivation to work slowly did not expect such a motivation to depress his score beyond 15 points, see, e.g. N.T.

<u>Atkins</u> Hearing, 11/17/2011, at 139 (Dr. Spangler testifying that a lack of motivation will decrease an I.Q. score by an average of 15 points), thus rendering the effect harmless within the context of the considered issue. The PCRA court relied on all of the experts, including the Commonwealth's, in this respect. PCRA Ct. Op. at 8.

The Majority also disregard's the PCRA court's acceptance of Appellee's experts' opinions that the decrease from his earlier I.Q. scores (the 1972 score (80) and the 1979 score (85)) to the 2009 I.Q. score of 57 was attributed to neurological impairments that happened after 1979. Maj. Slip. Op. at 36. According to the PCRA court, Dr. Martell testified that Appellee likely suffered dementia as a teenager as a result of boxing and from exposure to neurotoxins from his family's kennel and his contact with chemicals in his lawn care business. PCRA Ct. Op. at 8. The court then observed the evidence in the record that from the age of ten until he left home at 18, Appellee used creosote four to five times a year, inhaling the vapors and absorbing it through his skin, and was exposed to the pesticide Sevin, which the family used to treat the dogs for fleas and ticks. <u>Id</u>. at 8-9. When Appellee started his lawn care business, he was exposed to malathion, which he used to treat lawns without a respirator or protective clothing. <u>Id</u>. at 9. The court noted that in 1990 these products were found to cause mental retardation. <u>Id</u>. As further evidence that Appellee suffered from neurological impairments as a result of boxing and his exposure to neurochemicals, the PCRA court relied on the testimony of Dr. Armstrong, who concluded, based on her administration of 45 neurological tests, that Appellee had "an unusually severe profile of neuro-psychological impairments." PCRA Ct. Op. at 11; N.T., <u>Atkins</u> Hearing, 11/15/2011, at 96.

The Majority asserts that the defense did not demonstrate a causal connection between the chemicals to which Appellee was exposed, specifically, creosote, Sevin, and malathion, and his subsequent drop in I.Q. However, Dr. Armstrong asserted in her report that Sevin "inhibits cholinesterase, and is also linked with memory impairment," and that "Malathion binds with cholinesterase, and causes memory impairment in humans." Reproduced Record (R.R.) Vol. 3, 18R. Dr. Martell testified that these chemicals are organophosphates which kill the nervous system of humans. N.T., Atkins Hearing, 5/12/2011, at 22; id. at 26 ("One of the things with these neurotoxins is they are cumulative. They are stored in the fat in our bodies. The fat kind of concentrates and magnifies them. So the more you are exposed to it, the more it builds up in your system and then the more corrosive it is on your brain and nervous system."); id. at 158 (Dr. Martell noting that creosote was banned in 1990 because of the risk it posed to the nervous system).

As Dr. Armstrong explained, the chemicals with which Appellee had worked in the past have been discovered to cause brain injury, specifically impacting the memory.[6] She continued that these chemicals also affect the central nervous system

_____

[6]     Dr. Armstrong testified:

He was working with a lot of toxic chemicals that we know cause brain injury, specifically to memory, probably beyond memory, but results from studies -- they're depending on animal studies -- where we know how to test memory. Studies aren't being done on humans for obvious reasons. And so -- in any case, we know that the chemicals -- that he worked with insecticides, even herbicides, the creosote, all can cause destruction of the laying down of memory, destruction of memory systems.

N.T., Atkins Hearing, 11/15/2011, at 103.

and neurological functioning.[7]   On cross examination, Dr. Armstrong explained that mental retardation is a neurological problem, and neurological problems result from repeated, excessive exposure to chemicals that effect the nervous system.  N.T., Atkins Hearing, 11/15/2011, at 213-216.  Acknowledging that malathion is used to treat head lice, Dr. Armstrong testified that this was controversial, as many disagreed with its use for that purpose, and that using it one time was of a different degree than its repeated use causing a buildup in the body.  Id.  As a neurologist, the neurological impact of these chemicals was within the witness's expertise.   Moreover, the Commonwealth attempted to discredit her, and she did not waiver from her opinion that repeated exposure, as experienced by Appellee, would have had a neurological impact.   She notably verified that Appellee in fact had neurological impairments through her testing and evaluation of him.  Thus, in her expert view, his objective status was consistent with her expectation premised on his history.  I see no error in the PCRA court accepting her opinion, and I disagree with the Majority that the record does not support the PCRA court's findings and conclusions in this regard.

---

[7]      Specifically, she testified as follows:

> . . . it's not just the creosote.  It's -- it's the carbaryl, which is known to cause memory loss; the malathion, which is an insecticide, that affects -- that's known to affect the CNS [central nervous system] and it causes a variety of neurological symptoms in humans including memory . . . And even the herbicides that he used, the Roundup that he used to spray around the lawns, that causes abnormal cell signaling.  These insecticides tend to accumulate in fatty tissues.  So they don't -- they're not breathed out or metabolized quickly. They remain in the body for awhile. So these are drugs that we know that would affect neurological functioning.

N.T., Atkins Hearing, 11/15/2011, at 105-06.

In a similar vein, the Majority asserts there was no evidence that Appellee was ever injured during his participation in the boxing program, undermining the PCRA court's factual finding on this matter. Maj. Slip Op. at 36. However, Dr. Armstrong's report indicated that the neurological defects she encountered were consistent with "boxing and sparring with frequent head blows." R.R. Vol. III at 18R. Moreover, she obtained this information from Appellee. N.T., Atkins Hearing, 11/15/2011, at 104 ("He told me that he had -- I asked him to try to quantify how many blows to the head and gave different estimates and he could choose what he thought fit. And he said probably at least a hundred blows to his head."). Appellee's mother testified that in addition to one significant blow, there were other injuries that caused her concern. Id. at 15 (". . . he came home with just too many injuries. There were times when he would go to bed at six o'clock at night and I'd have to go and keep waking him up, just to make sure that he was all right."); id. at 71 ("There were plenty of other times where his ear would be swollen or, you know, bruised eye, things of that nature."). Whether the Majority believes that this evidence was credible is not relevant. The fact finder accepted Ms. Hackett's testimony and Dr. Armstrong's opinion in this regard, and there is record support for it. Because the PCRA court's finding of sub-average intellectual functioning was amply supported by the record, this Court is bound by these factual findings.

Moving to whether Appellee demonstrated "significant adaptive limitations," Williams, 61 A.3d at 983, which is the second factor from our definition of mental retardation in Miller, we have explained that "[a]lthough an individual's I.Q. score is the primary measurement for limited intellectual functioning, because the interaction between limited intellectual functioning and deficiencies in adaptive skills is necessary

to establish mental retardation, a sufficiently high I.Q. score, in itself, will not bar a court from finding an individual is mentally retarded." Williams 61 A.3d at 983; Miller, 888 A.2d at 630–31. Similarly, a low I.Q. score will not "in itself categorize a person as mentally retarded." Williams, 61 A.3d at 983; Miller, 888 A.2d at 630–31.[8] In addressing the adaptive behavior criteria, we have accepted that the focus is on an individual's weaknesses, not his strengths. Williams, 61 A.3d at 992.

The PCRA court heard from five experts - four for Appellee and one for the Commonwealth - as well as lay witnesses, over the course of several days. It considered the evidence presented, weighed the expert opinions, made credibility determinations, and ultimately found, based on the totality of the evidence, that Appellee demonstrated the adaptive limitations required by the Miller test to prove

---

[8] We have defined adaptive behavior as "the collection of conceptual, social, and practical skills that have been learned by people in order to function in their everyday lives, and limitations on adaptive behavior are reflected by difficulties adjusting to ordinary demands made in daily life." Williams, 61 A.3d at 983-84; Miller, 888 A.2d at 630. According to the AAIDD, significant limitations in adaptive functioning means "performance that is at least two standard deviations below the mean of either (a) one of the following three types of adaptive behavior: conceptual, social, or practical, or (b) an overall score on a standardized measure of conceptual, social and practical skills." Williams, 61 A.3d at 983-84; Miller, 888 A.2d at 630. In addition,

> The DSM–IV requires significant limitations in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety. For assessing adaptive ability, the DSM–IV also considers "the suitability of the instrument to the person's socioeconomic background, education, associated handicaps, motivation, and cooperation.... In addition, behaviors that would normally be considered maladaptive (e.g., dependency, passivity) may be evidence of good adaptation in the context of a particular individual's life (e.g., in some institutional settings).

Williams, 61 A.3d at 983-84 (internal citations omitted).

mental retardation. PCRA Ct. Op. at 15. There is a wealth of evidence to support this finding.

Specifically, Dr. Martell testified that in his opinion, under the DSM-IV guidelines, Appellee was impaired in five of the eleven categories: functional academics; social and interpersonal skills; self-direction; self-care; and safety. All of the defense experts agreed with Dr. Martell in this regard. N.T., Atkins Hearing, 5/12/2011, at 38 (Dr. Martell); id. 5/11/2011, at 65-66 (Dr. Crown); id. 11/15/2011, at 135-36 (Dr. Armstrong); id. 5/12/2011, at 197-99 (Dr. O'Brien). The PCRA court accepted this testimony and thus was within its discretion to conclude that Appellee was impaired in these five adaptive functioning categories.

With respect to functional academics, Dr. Martell reviewed Appellee's academic records and found clear evidence of impairment in this category. For instance, Appellee had to repeat the first grade three times. N.T., Atkins Hearing, 5/12/2011, at 40 ("I've seen a lot of people. I think this is the first time I've ever seen someone who had to repeated [sic] first grade three times. That to me speaks of a very early onset and profound impairment that one would need to do that."). As a result, he was placed in the Ashbourne school, where he was labeled "brain injured" and "required intensive one on one support and supervision as he continued to struggle academically, was consistently behind his grade level [academically],. . . and had difficulty understanding abstract concepts." PCRA Ct. Op. at 11-12; N.T., Atkins Hearing, 5/12/2011, 41 ("[Appellee] took this Metropolitan Achievement Test at age nine-and-a-half and that placed his math and reading scores at the second grade level, which is significantly below where one should be at that age."); id. (noting that a progress report from when

Appellee was ten stated that he "seems to still have difficulty with abstract aspects such as the months, time and the relationship between such things as continents, countries, states and cities."). See also N.T., Atkins Hearing, 5/12/2011, at 40 (reading from a 1980 individualized education plan for Appellee that provided: "The multi-disciplinary team finds [Appellee] to be brain injured and unable to benefit from a special education program . . . at a public school special education class at this time."); id. at 41-42 ("So after age 10 when he would be in fifth grade, he's functioning at a second grade level. And then finally by . . . age 16 he was only functioning at a sixth grade level in reading and fourth or fifth grade level in math.").

In addition, Appellee's former teacher from the Ashbourne school, Judy Pezola, testified that she taught him for a year from 1974-75, and that the school was for "kids who were labeled learning disabled; kids who were labeled brain injured; kids who were labeled emotionally disturbed. . ." N.T., Atkins Hearing, 5/11/2011, at 9. Ms. Pezola recalled that when Appellee was ten years old, he read at a second grade level and could not independently complete age appropriate academic work. Id. at 12.

With regard to social and interpersonal skills, the PCRA court noted Dr. Martell's testimony that Appellee's school records indicated significant deficits in this skill area, referring to an Ashbourne school progress report referring to his susceptibility to manipulation, N.T. Atkins Hearing, 5/12/2011, at 47 ("[Appellee] allows himself to be manipulated by his classmates."), and another progress report indicating that he did not interact appropriately with his peers and did not tolerate frustration adequately. Id. ("Past and present teacher observation indicate that [Appellee] does not interact

appropriately with any of his peers. Does not tolerate frustration adequately."); PCRA Ct. Op. at 13.

In accepting Dr. Martell's testimony about Appellee's social and interpersonal skills, the PCRA court noted that it was consistent with testimony it heard from lay witnesses such as Appellee's mother and aunt, who testified that as a child Appellee had few friends, had trouble making friends, and preferred to socialize with children who were much younger. PCRA Ct. Op. at 13; N.T., Atkins Hearing, 5/13/2011, at 9-11; id. at 82.

Turning to the skill area of self-direction, the PCRA court accepted Ms. Pezola's testimony that Appellee required structure and supervision to complete a task, and that it was necessary to provide step-by-step instructions to him. PCRA Ct. Op. at 13; N.T., Atkins Hearing, 5/11/2011, at 30. The PCRA court found this testimony consistent with other testimony that Appellee was able to follow specific instructions of limited scope and duration on his own, but was unable to follow directions on relatively simple activities, such as learning to jump rope. PCRA Ct. Op. at 14; N.T., Atkins Hearing, 5/13/2011, at 10.

Similarly, with respect to the skill area of self-care, the PCRA court accepted Appellee's expert's opinion that his history demonstrated impairments in this area. PCRA Ct. Op. at 15. Specifically, the PCRA court accepted testimony that Appellee frequently wet the bed until age ten or eleven; suffered from enuresis (self-wetting) into his teens; had difficulty tying his own shoes and using utensils consistently; and needed supervision while getting dressed to prevent him from wearing his clothes backwards or putting his shoes on the wrong feet. N.T., Atkins Hearing, 5/12/2011, at 48-49.

Finally, as to safety, the fifth skill area which Dr. Martell identified Appellee as impaired, the PCRA court accepted Appellee's evidence of several instances which showed, in the opinions of the experts, a dangerous disregard for his own safety. Specifically, the PCRA court noted one instance where Appellee injured himself when he climbed a tree and attempted to remove branches with a chainsaw while intoxicated. PCRA Ct. Op. at 15; N.T., Atkins Hearing, 5/12/2011, at 50; N.T., Atkins Hearing, 11/15/2011 at 210. Additionally, on one Fourth of July, Appellee held onto a lit firecracker until it exploded, and, at another time, alarmed his family members by jumping into a waterfall without any regard for his safety. PCRA Ct. Op. at 16-17; N.T., Atkins Hearing, 5/12/2011, at 135-36.

Accepting this testimony, and finding it credible, the fact finder concluded that Appellee demonstrated adaptive limitations as required by the Miller definition of mental retardation. In reaching this conclusion, the PCRA court considered the evidence from Appellee's life that indicated a lack of adaptive functioning and the expert's testimony providing insight into this evidence, and ultimately concluded, as the experts testified, that some limited adaptive functioning in Appellee's employment did not undermine the specific lack of adaptive functioning in the five skill areas identified by Dr. Martell.

To the extent the Majority is critical of Dr. Martell's opinion about Appellee's functional academics, alleging it was formed without a complete review of all of Appellee's school records, see Maj. Slip Op. at 37, this fact was brought out on cross-examination, and Dr. Martell stated that the records he had not reviewed did not alter his opinion. N.T., Atkins Hearing, 5/12/2011, at 113. Similarly, the Majority notes that although some members of Appellee's family claimed he could not tie his shoes and

that he wet himself, Ms. Pezola (his former teacher at the Ashbourne school) could not recall such problems. This type of conflicting testimony is proverbial in these cases, and is for the fact finder to evaluate. After careful consideration, the PCRA court accepted the family members' testimony. The fact that there is evidence to the contrary in the record does not invalidate the PCRA court's finding.

Further, the Majority faults the PCRA court for failing to recognize that when Appellee injured himself after he climbed a tree and attempted to remove tree branches, he was intoxicated. To the contrary, however, the PCRA court explicitly recognized this. PCRA Ct. Op. at 15. The court nevertheless accepted Dr. Martell's characterization of this incident as one of three demonstrating deficits in the skill area of personal safety.

Next, the Majority asserts that the PCRA court should have considered evidence that, in his adult life, Appellee had no adaptive limitations that prevented him from running a business. Maj. Slip Op. at 38. However, the PCRA court heard evidence about Appellee's work in this regard, and also heard expert testimony that this evidence did not alter the experts' ultimate opinions. Indeed, it is noteworthy that Dr. Martell declined to find that Appellee demonstrated a lack of adaptive functioning in the skill area of work, which is one the eleven aspects identified in the DSM-IV. See Williams, 61 A.3d at 983-84; n.3, supra. The PCRA court acknowledged that Appellee operated two businesses, completing tasks that required a low level of intellectual ability and which could be learned by repetition, PCRA Ct. Op. at 15, and with the assistance of friends and family. Id.; N.T., Atkins Hearing, 11/15/2011, at 25. Ultimately, the PCRA Court accepted the testimony of Appellee's experts that none of Appellee's actions or

responsibilities were inconsistent with a diagnosis of mental retardation. Again, this conclusion was well within its sound discretion.

Further, the Majority highlights evidence in the record that shows that Appellee was manipulative and could communicate effectively. Maj. Slip Op. at 38-39. This evidence, however, was presented to the experts and the PCRA court, and the court found that because Appellee showed adaptive limitations in five of the eleven categories, he had met his burden of proving adaptive limitations as defined by the DSM-IV and adopted by this Court in Miller.

The PCRA court further considered evidence about a telephone conversation recorded while Appellee was incarcerated, in which he explained stock trading and difficult trading concepts to his mother, finding credible the conclusions of Appellee's experts that there was no evidence he actually understood what he was saying, and, further, that even if Appellee understood the concepts he was explaining, it did not alter their opinion that he was mentally retarded. N.T., Atkins Hearing, 5/11/2011, at 129-131 (Dr. Crown stating that mentally retarded people can invest in the stock market and calculate their gains or losses); N.T., Atkins Hearing, 11/15/2011, at 144 (Dr. Armstrong opining that hearing Appellee discuss stock trading did not alter her opinion in any respect); N.T., Atkins Hearing, 5/11/2011, at 165 (Dr. Crown testifying that with respect to learning about stock trading, Appellee is educable and could have been repeating something he heard); N.T. Atkins Hearing, 5/12/2011, at 188 (Dr. O'Brien testifying that ". . . I think the comments about the stock sales and stuff like that, I think it's all part of that sort of bravado to try to show how normal he is and how active he is, how functional he is.").

The PCRA court was capable of finding that Appellee is mentally retarded despite the evidence presented by the Commonwealth and relied on by the Majority as demonstrating his adaptive capabilities. Maj. Slip Op. at 37-40. See Williams, 61 A.3d at 992 (holding that "[t]he PCRA court was capable of finding appellee is mentally retarded although he is the main provider for his family and able to hold basic jobs. As expressed by several of appellee's experts, the focus should be on an individual's weaknesses—not his or her strengths—as mentally retarded people can function in society and are able to obtain and hold low-skilled jobs, as well as have a family."). We have explained that the DSM–IV and AAMR's definitions of mental retardation accept an individual's classification as mentally retarded "even though he may have relatively strong skills in distinct categories." Id. Accordingly, the Majority's suggestion that the PCRA court erred in finding that Appellee has significant adaptive deficiencies because he could communicate effectively, run a lawn care business with the assistance of family, or plan the murder for which he was convicted, is erroneous.

The final criteria for mental retardation is onset of the condition before age 18. Miller, 888 A.2d at 630. As support for finding this criteria, the PCRA court relied on the individualized education plan from 1980 that stated Appellee was "brain injured" and unable to benefit from public school special education, N.T., Atkins Hearing, 5/12/2011, at 40; and a 1974 progress report from the Ashbourne school stating that Appellee had difficulty grasping abstract concepts and could not form letters correctly, id. at 42. PCRA Ct. Op. at 17. Additionally, the court relied on evidence that when Appellee was ten years old, he was reading at a second grade level, and when he was sixteen, he was functioning at a sixth grade level in reading, and a fourth or fifth grade level in math.

Id.; N.T., Atkins Hearing, 5/12/2011, at 42. The PCRA court noted that this evidence was corroborated by testimony from Ms. Pezola and Appellee's family members. The court's finding as to this last criterion from Miller is adequately supported in the record.

On the last page of the PCRA court's opinion, it indicates that it reviewed all of the testimony and the submitted briefs, and found that Appellee met, by a preponderance of the evidence, the threshold definition of mental retardation defined by this Court in Miller. PCRA Ct. Op. at 19. The PCRA court "found the testimony by [Appellee's] witnesses regarding these claims of intellectual development to be credible, reliable, and persuasive and now holds accordingly that relief should be granted." Id. Given the testimony offered by numerous lay witnesses, the opinions of five experts, four of whom testified Appellee has mental retardation, and the various records and reports, the PCRA court's determination that Appellee met his burden of establishing that he has mental retardation is supported by the record. I believe this Court is constrained to affirm, notwithstanding individualized preferences to the contrary, and therefore dissent from the Majority's improper re-weighing of the evidence.

Mr. Justice Saylor and Madame Justice Todd join this dissenting opinion.